OSI SYSTEMS, INC., Plaintiff,

v.

INSTRUMENTARIUM
CORPORATION,
Defendant.

C.A. No. 1374–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Jan. 5, 2006.
Decided: March 14, 2006.

Peter J. Walsh, Jr., Kevin R. Shannon, Melony R. Anderson, Abigail M. LeGrow, Potter Anderson & Corroon, L.L.P., Wilmington, DE, for Plaintiff/Counterclaim Defendant.

Collins J. Seitz, Jr., Christos T. Adamopoulos, Connolly Bove Lodge & Hutz, L.L.P., Wilmington, DE; Joseph R. Guerra, Brian R. Matsui, Sidley Austin Brown & Wood, L.L.P., Washington, DC, for GE Healthcare Finland OY, as the successor-in-interest to Instrumentarium Corporation.

OPINION

STRINE, Vice Chancellor.

In this case, the buyer and seller in the sale of a business are dueling over the type

of contractual arbitration that must be used to solve a disagreement between them. Each seeks judgment on the pleadings arguing that the purchase agreement plainly dictates a ruling in favor of arbitration of the kind it prefers.

In this opinion, I conclude that the buyer must use the form of contractual arbitration designed to address claims for breach of representations and warranties and other contractual indemnity claims rather than a narrower form of arbitration that is designed only to resolve disputes regarding the change in the amount of working capital that the sold business had as of June 30, 2003 and had as of the later closing of the purchase, measured using consistent accounting principles. Because the buyer's claims rest fundamentally on its assertion that the seller premised its financial statements and estimates of working capital on accounting judgments that violated generally accepted accounting principles, the buyer's claims involve a claim for breach of a representation and warranty. Such claims fall under the purchase agreement's indemnity provisions and the form of arbitration set forth in those provisions must be used by the buyer. Therefore, I grant the seller's motion for judgment on the pleadings and deny the buyer's motion.

## I. *Factual Background*

On March 19, 2004, the plaintiff OSI Systems, Inc. purchased a medical products and services business, which can be called Spacelabs, from defendant Instrumentarium Corporation, a Finnish Corporation.[1] The opportunity OSI had to buy Spacelabs arose from Instrumentarium's own purchase by General Electric in autumn 2003. As a condition for anti-trust approval of its acquisition of Instrumentarium, GE was required to have Instrumentarium divest itself of Spacelabs. During the divestiture period, GE was restricted from participating in the operation of, or in obtaining information regarding, Spacelabs. In other words, even though GE became the owner of Instrumentarium on October 9, 2003, it never played any role in the management of Spacelabs.

OSI paid approximately $46.641 million to purchase Spacelabs. The price was set consistent with the terms of the "Purchase Agreement" between OSI and Instrumentarium, which was executed on January 2, 2004.

The Purchase Agreement contains a provision describing the calculation of a final purchase price. To arrive at a final purchase price, that provision begins by stating a nominal purchase price of $57.384 million, which then is adjusted primarily through the so-called "Closing Adjustment" but also through the deduction of other items not relevant to this dispute.[2] The "Closing Adjustment Formula" is driven by a comparison of Spacelabs's Modified Working Capital as of June 30, 2003 and a Final Modified Working Capital Statement as of the Closing Date, March 19, 2004. The June 30, 2003 Modified Working Capital was quantified in a "Reference Statement of Working Capital," which was identified in § 3.06 of the Purchase Agreement and attached to § 3.06(a) in Instrumentarium's Disclosure Statement to the Purchase Agreement. In the Reference Statement, Modified Working Capital as of June 30, 2003 was quantified at $85.1 million.

---

1. Instrumentarium's successor-in-interest is GE Healthcare Finland OY. For clarity, I continue to refer to GE Healthcare Finland OY, the seller, by the name it had as of the Purchase Agreement at issue, which was Instrumentarium.

2. Purchase Agreement § 2.05.

The Closing Adjustment Formula uses the $85.1 million figure derived from the Reference Statement as a baseline for measuring the ultimate Price Adjustment that is to be made, if any. The Closing Adjustment is calculated by subtracting $85.1 million from a Statement of Estimated Closing Modified Working Capital that Instrumentarium was to prepare two days before the anticipated Closing Date.[3] If the amount of Estimated Closing Modified Working Capital was higher than $85.1 million, then the amount of the overage would inure to Instrumentarium's benefit by increasing the nominal purchase price of $57.384 million set out in the Purchase Agreement. Likewise, if the amount of Estimated Closing Modified Working Capital was lower than $85.1 million, then the amount of the overage would inure to OSI's benefit by decreasing the nominal purchase price set out in the Purchase Agreement of $57.384 million.

As it turned out, Instrumentarium's Statement of Estimated Closing Modified Working Capital came in at $82.217 million. Therefore, the Closing Adjustment was determined to be a negative one that lowered OSI's purchase cost by approximately $7.8 million.[4]

But the Purchase Agreement gave OSI the right to prepare its own estimate of modified working capital within sixty days of the Closing Date. That estimate—the Initial Modified Working Capital Statement—was to be "prepared in accordance with the Transaction Accounting Principles applied consistently with their application in connection with the preparation of the Reference Statement of Working Capital and the Statement of Estimated Closing Modified Working Capital and shall otherwise contain at least the same line items as the Reference Statement of Working Capital...."[5] As one would expect, the Initial Modified Working Capital Statement could be used by OSI to argue that the Closing Adjustment should have been more favorable to it, and sets up a process for resolving any dispute between OSI and Instrumentarium regarding that issue.

Eliding much of the complexity of that process because of its irrelevance to the current dispute, I skip to the final step of that process. In that final step, OSI and Instrumentarium are to submit their differences—which are to be spelled out in a Notice of Disagreement—to "an independent certified public accounting firm in the United States of recognition mutually acceptable to Instrumentarium and [OSI]" (the "Independent Accounting Firm").[6] The Independent Accounting Firm's job is to make a "final determination, binding on the parties ..., of the appropriate amount of each of the line items in the Initial Modified Working Capital Statement as to which Instrumentarium and [OSI] disagree as set forth in the Notice of Disagreement."[7]

The current dispute has its origins in OSI's Initial Modified Working Capital Statement, which was submitted to Instrumentarium on June 11, 2004. In that Statement, OSI estimated that Spacelabs's Modified Working Capital as of the Closing Date of March 19, 2004 was only $54.361 million or some $30 million lower than when calculated by Instrumentarium on June 30, 2003. Using the Closing Adjustment Formula, OSI contended that it

---

3. Purchase Agreement, § 2.06(a)-(b).

4. As mentioned previously, in addition to the Closing Adjustment, other items are part of the calculation of a final purchase price.

5. Purchase Agreement § 2.09(a).

6. *Id.* at § 2.10(c).

7. *Id.*

was entitled to a downward Closing Adjustment of approximately $25.347 million or approximately 54%.

This lawsuit does not arise because of the magnitude of the Closing Adjustment that OSI calculates but because of the method by which OSI came to its conclusion. By OSI's admission, it did not apply the same accounting principles that Instrumentarium had used to produce either the Reference Statement or the Statement of Estimated Closing Modified Working Capital. OSI altered many of the accounting principles used by Instrumentarium on the ground that those principles were not compliant with generally accepted accounting principles in the United States, or U.S. GAAP, as required by the Purchase Agreement's definition of "Transaction Accounting Principles."

Because of OSI's decision to use different accounting principles in the preparation of its Initial Modified Working Capital Statement, Instrumentarium refused to engage in arbitration under § 2.10(c) of the Purchase Agreement. Instrumentarium justified that decision by reference to other terms of the Purchase Agreement. In essence, Instrumentarium argued that OSI was not merely contending that there was a difference of opinion about the change in Working Capital at Spacelabs between June 30, 2003 and the Closing Date; rather, OSI was alleging that the baseline Reference Statement of Working Capital prepared by Instrumentarium for Spacelabs did not use Transaction Accounting Principles, because the accounting used in connection with that Reference Statement and in preparing Spacelabs's financial statements did not comply with U.S. GAAP. Because of that assertion, OSI did not use the same accounting principles in preparing its Initial Modified Working Capital Statement as had been used by Instrumentarium in preparing the Reference Statement. Thus, the difference in the Working Capital calculations in each document did not result primarily from changes in Working Capital that occurred as a result of business activity between June 30, 2003 and the Closing Date but from a fundamental alteration in accounting principles. In other words, application of the accounting principles used by OSI in its Initial Working Capital Statement as of the June 30, 2003 date of the Reference Statement would have resulted in a calculation of Modified Working Capital as of that date that was much lower than $85.1 million.

According to Instrumentarium, a claim premised on the proposition that the Reference Statement of Working Capital did not comply with U.S. GAAP in the first instance is one for breach of a representation and warranty that is governed by a contractual indemnity provision in the Purchase Agreement that requires arbitration before a law-trained arbitrator ("Legal Arbitration").[8] In further support of that proposition, Instrumentarium noted that the Independent Accounting Firm was supposed to apply the same accounting principles as were used in the Reference Statement in resolving any differences about Spacelabs' Modified Working Capital as of the Closing Date. To the extent that OSI sought to have different principles applied, it was bound to go to Legal Arbitration and prove that the principles used in preparing the Reference Statement were not in compliance with U.S. GAAP, proof that would show that Instrumentarium had breached a representation and warranty. Based on that reasoning, Instrumentarium refused to engage in Closing Adjustment Arbitration but insist-

8. Purchase Agreement § 11.11.

ed that the parties settle their differences in Legal Arbitration.

This litigation then ensued, with OSI filing suit to demand that Instrumentarium engage in Closing Adjustment Arbitration to resolve the parties' differences about the Closing Adjustment. Instrumentarium filed a counterclaim, contending that OSI was bound to raise any contention that the accounting principles used in preparing the Reference Statement were not in compliance with GAAP in Legal Arbitration. The parties then filed cross-motions for judgment on the pleadings. This opinion resolves those motions.

## II. *Legal Analysis*

### A. *Procedural Framework*

Before grappling with the basic dispute, I first set forth the procedural standards that apply to the motions. The standard for judgment on the pleadings is well-settled. Under Court of Chancery Rule 12(c), a motion for judgment on the pleadings may be granted where no material issue of fact exists and where the moving party is entitled to judgment as a matter of law.[9] When there are cross-motions for judgment on the pleadings, the court must accept as true all of the non-moving party's well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party.[10] The court also

may consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference.[11]

■■■■ To begin, I must examine closely the terms of the agreements that were incorporated by reference into OSI's complaint.[12] Under Delaware law, the "proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal,"[13] and "judgment on the pleadings ... is a proper framework for enforcing unambiguous contracts."[14] Here, neither party suggests the terms of the agreements are ambiguous or that useful parol evidence exists. I agree with them that the Purchase Agreement's meaning is unambiguous when the Agreement's words are considered as a whole.[15]

### B. *Resolution Of The Parties' Contending Arguments*

■■■ OSI's argument as to why Instrumentarium must engage in Closing Adjustment Arbitration is deceptively simple. According to OSI, it is not accusing Instrumentarium of a breach of representation and warranty. It is simply arguing that the amount of Modified Working Capital that Spacelabs had as of the Closing Date must be calculated under accounting principles that comply with U.S. GAAP. To the

9. *E.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1205 (Del.1993); *Dweck v. Nassar*, 2005 WL 3272363, at *4 (Del.Ch. Nov. 23, 2005).

10. *E.g., BAE Systems North Am., Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *3 (Del.Ch. Aug. 3, 2004).

11. *E.g., Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *1, *9 n. 33 (Del.Ch. Dec. 7, 1999).

12. *E.g., McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del.Ch.2000); *In re Lukens*

*Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch.1999).

13. *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del.1991) (*quoting Klair v. Reese*, 531 A.2d 219, 222 (Del.1987)).

14. *NBC Universal, Inc. v. Paxson Comm. Corp.*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005).

15. *E.g., FGC Holdings Ltd. v. Teltronics, Inc.*, 2005 WL 2334357, at *5 n. 47 (Del.Ch. Sept.14, 2005).

extent that it can prove to the Independent Accounting Firm that Instrumentarium's Reference Statement of Working Capital was not based on U.S. GAAP, it should be able to have the benefit of the full difference of a Closing Adjustment based on the difference between the Modified Working Capital as of the Closing Date as calculated under U.S. GAAP and the $85.1 million sum in the Reference Statement, even though the difference will result primarily from the use of different accounting principles. For the following reasons rooted firmly in the text and structure of the Purchase Agreement, I reject that argument.

Let me begin by pointing out that the text of § 2.10(c) does not suggest that Closing Adjustment Arbitration was intended to address issues of the scope that OSI now seeks to sweep within its ambit. By its plain terms, § 2.09(a) required OSI to prepare its Initial Modified Working Capital Statement "in accordance with the Transaction Accounting Principles applied consistently with their application in connection with the preparation of the Reference Statement of Working Capital and the Statement of Estimated Closing Modified Working Capital...." [16] Section 2.10(c) therefore appears on its face to simply contemplate the use of an Independent Accounting Firm if there are differences of opinion about the amount of Modified Working Capital as of the Closing Date when applying the same Transaction Accounting Principles used in the Reference Statement in a consistent manner. OSI's current position involves the Independent Accounting Firm in an entirely different and more ambitious role: that of determining that the Transaction Accounting Principles used in the Reference Statement were not compliant with U.S. GAAP.

OSI has a textual basis for arguing that is proper. And it is rooted in the definition of Transaction Accounting Principles in the Purchase Agreement. That term:

> ... means U.S. GAAP; *provided, however,* that: (i) with respect to any matter as to which there is more than one principle of U.S. GAAP, Transaction Accounting Principles means the principles of U.S. GAAP applied in the preparation of the Financial Statements, (ii) Taxes shall not be taken into account in computing Working Capital and (iii) Transaction Accounting Principles shall include the accounting policies and be subject to the exceptions described in *Exhibit B.*[17]

Therefore, says OSI, if the Reference Statement was prepared on the basis of accounting principles that did not comply with GAAP, then the Reference Statement did not use Transaction Accounting Principles. If that is so, a decision by the Independent Accounting Firm to base its calculation of Modified Working Capital as of the Closing Date on different principles that are GAAP-compliant is necessary in order to make sure that the Transaction Accounting Principles—which require use of U.S. GAAP—are the basis for the Closing Adjustment.

As we shall now see, that very argument in itself tends to demonstrate that Legal Arbitration is required. By that argument, OSI concedes that it is contending that the Reference Statement was not based on principles of accounting consistent with U.S. GAAP. It is only by concluding that the proposition is correct that the Independent Accounting Firm could accept OSI's Initial Modified Working Capital Estimate, which blatantly deviates from the accounting principles used in the

**16.** Purchase Agreement § 2.09(a).

**17.** Purchase Agreement Ex. A ("Definitions").

preparation of the Reference Statement. But the assertion that the Reference Statement did not comply with U.S. GAAP is also necessarily an assertion that Instrumentarium breached a representation and warranty.

This is made clear by the Purchase Agreement's terms. Like most acquisition agreements, the Purchase Agreement required Instrumentarium to represent and warrant that its financial statements were materially accurate and in accordance with U.S. GAAP. That part of the Purchase Agreement states:

> Section 3.06(a) of the Disclosure Schedule sets forth (i) the adjusted unaudited consolidated balance sheet of the Business at September 30, 2003 and the normalized unaudited consolidated statements of income of the Business for the years ended December 31, 2001 and 2002 and for the nine months ended September 30, 2003 (collectively, the "*Financial Statements*") and (ii) the unaudited Statement of Working Capital of the Business as of June 30, 2003 (the "*Reference Statement of Working Capital*"). The Financial Statements are true and correct in all material respects and present fairly, in all material respects, the financial condition and results of operations of the Business at their respective dates and for the periods covered by such statements in conformity with the Transaction Accounting Principles applied consistently and have been prepared in accordance with the books and records of the Sellers, which books and records have been maintained in a manner consistent with past practice.... [18]

In its papers, OSI, rather oddly, claims that § 3.06 does not constitute a representation and warranty that the Reference Statement is materially accurate and presented fairly the Modified Working Capital of Spacelabs as of June 30, 2003 in conformity with the Transaction Accounting Principles. It bases this assertion on the definition of Financial Statements in subsection (i) of the first sentence of § 3.06(a) and its failure to include the Reference Statement as a Financial Statement whose material accuracy and conformity with Transaction Accounting Principles is covered by the second sentence of § 3.06(a).

That infelicity does not create ambiguity that aids OSI, however. By OSI's own admission, Spacelabs's Working Capital was a material consideration of the parties in determining the price that was to be paid by OSI to buy it. Moreover, the Reference Statement itself played an important role in the final calculation of the Purchase Price, as it was a factor in the Closing Adjustment Formula. Thus, it would be odd to think that Instrumentarium would be permitted to get away with not warranting the material accuracy and GAAP-compliance of the Reference Statement.

Fortunately, the Purchase Agreement itself clears up any lack of clarity that an isolated reading of § 3.06 might appear to create.[19] Section 11.01 of the Agreement addresses the survival of representations, warranties, covenants and agreements beyond Closing. That section explicitly

---

18. Purchase Agreement § 3.06(a).

19. *See First Olefins Ltd. P'ship v. Am. Olefins, Inc.*, 1996 WL 209719, at *7 (Del.Ch. Mar.1, 1996) ("Complex commercial contracts are best interpreted not by focusing on a single clause, but by considering the parties' language in the context of their entire agreement...."); *FGC Holdings*, 2005 WL 2334357, at *5 ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").

states that the "representations and warranties made in Section 3.06(a)(ii) shall survive the Closing until the date on which the Final Modified Working Capital Statement becomes such...." Section 3.06(a)(ii) is, of course, the subsection of sentence one of § 3.06 that deals with the Reference Statement. Therefore, § 11.01 makes clear that OSI bargained to have the Reference Statement's material accuracy and compliance with GAAP represented and warranted.

The Purchase Agreement contains other text that also cuts against OSI's attempt to isolate the Reference Statement from the Financial Statements. In an annex, further detail on the meaning of Transaction Accounting Principles was provided that states:

> The Financial Statements and the Reference Statement of Working Capital present the operations of the Business as conducted by the Business Subsidiaries and the Asset Sellers.
>
> *Basis of Presentation and Use of Estimates*
>
> The Financial Statements and the Reference Statement of Working Capital are derived from the financial statements prepared by Instrumentarium and Spacelabs.
>
> The preparation of the Financial Statements is in accordance with U.S. GAAP except as noted in the sections titled *"Excluded Items"* and *"Other Items."* The preparation of Financial Statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect reported amounts and related disclosures. Actual results could differ from those estimates.
>
> The following accounting policies were applied in preparation of the Financial

Statements. The Reference Statement of Working Capital is derived from the Financial Statements.[20]

The annex makes clear that the Reference Statement was based on the Financial Statements and prepared in accordance with the same Transaction Accounting Principles. Therefore, to the extent that OSI is contending that the Reference Statement was materially inaccurate because it was premised on accounting principles that do not comply with GAAP, it is also simultaneously arguing that the Financial Statements also violated GAAP, and that Instrumentarium breached § 3.06(a). This also is demonstrated by the fact that the Reference Statement quantifying Spacelabs's Modified Working Capital as of June 30, 2003 was derived from the Financial Statements. The warranted Financial Statements included both the ones that pre-dated June 30, 2003 but also Spacelabs's Financial Statements ending on September 30, 2003, which was warranted to be materially accurate and GAAP-compliant "at their respective dates and for the periods covered by such statements."[21] June 30, 2003 is within the period covered by the Financial Statements ending on September 30, 2003, and OSI clearly alleges that the accounting principles used in that Statement were not GAAP-compliant.

These realities—the narrow focus of the Adjustment Closing Arbitration process and OSI's decision to base its claim for a drastic Closing Adjustment on an argument that Instrumentarium breached its representations and warranties under § 3.06—have even more impact when they combine with another reality—the fact that a ruling for OSI would undermine the limitations on liability and the core dispute resolution mechanism contained in the

---

**20.** OSI App. Ex. D.

**21.** Purchase Agreement § 3.06(a).

Purchase Agreement. I turn to that reality now.

As is the case with many acquisition agreements, the Purchase Agreement contains complex provisions addressing the method by and extent to which OSI could obtain relief if Instrumentarium breached representations and warranties contained in the Purchase Agreement. In simple terms, the Purchase Agreement includes such claims under the broader heading of "Indemnification." [22] For present purposes, it suffices to note that the Purchase Agreement limits OSI to receiving damages of no more than 25% of the Purchase Price for a breach of representation and warranty claim.[23] That cap does not apply if OSI can prove that the breach resulted from fraud, willful misrepresentation or willful misconduct on the part of Instrumentarium.[24] Claims for Indemnification must be resolved through what I have called "Legal Arbitration," and not under the Closing Adjustment Arbitration Process set out in § 2.10(c). Rather, an Indemnification claim is to "be finally settled by binding arbitration in Wilmington, Delaware, administered by the CPR Institute for Dispute Resolution under its commercial Arbitration Rules then in effect, as amended by this Agreement." [25]

As Instrumentarium points out, OSI is seeking a Closing Adjustment that will reduce the purchase price from the $46.641 million paid at Closing to less than $21.294 million, a reduction of approximately 54%. The way that OSI seeks to obtain that drastic reduction is by funneling its contention that Instrumentarium's Financial Statements and Reference Statement were materially misleading and violative of GAAP into the narrower Closing Adjustment Arbitration Process. OSI would have the Independent Accounting Firm apply accounting principles that are inconsistent with the Reference Statement, even though § 2.06(c) requires accounting principles consistent with the Reference Statement to be used in the Closing Adjustment Process. As I read the Purchase Agreement, OSI may not do this.[26] Although it

---

**22.** As our Supreme Court has explained in the context of considering the scope of arbitration clauses, "When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the parties ... [A]rbitration is a mechanism of dispute resolution created by contract ... The policy that favors alternate dispute resolution mechanisms ... does not trump basic principles of contract interpretation." *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155–56 (Del.2002). This holds equally true when sophisticated parties decide on a scheme of dispute resolution that directs certain claims to one type of arbitration and other claims to a second type of arbitration.

**23.** Purchase Agreement § 10.01(c).

**24.** *Id.* at § 10.01(d).

**25.** Purchase Agreement § 11.11.

**26.** In *Westmoreland Coal Co. v. Entech, Inc.*, the New York Court of Appeals highlighted

the importance of consistent application of accounting principles noting "[w]hat is most important is that, when preparing financial statements intended to be used for comparative purposes, the methodology be consistently applied ... emphasis on consistent treatment can only reflect a purpose to flag changes in value occurring ... [between] [ ] the date of acquisition pricing [ ] and the closing date." 100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667, 671 (2003). In that case, the Court considered a contract similar to the Purchase Agreement in that purchase price adjustments were required to take into account changes in various figures, including working capital. *Id.* at 668. The purchaser complained that a particular closing statement necessary to make a purchase price adjustment did not comply with GAAP and therefore was a breach of the seller's representation and warranty that certain interim financial statements were prepared in compliance with U.S. GAAP. *Id.* The purchase agreement between the parties provided that the exclusive remedy for breach of a representa-

is correct that the term "Purchase Price" against which the 25% Indemnity Claim cap is measured is defined by a formula that includes the Closing Adjustment, a fair reading of the Purchase Agreement mandates the conclusion that OSI is seeking to end-run the contractual Indemnification process.

If OSI wishes to claim that the Reference Statement was not materially accurate because it was not based on GAAP-compliant accounting principles, it must prove that claim in a Legal Arbitration because that was the process the parties agreed would govern claims for breach of representations and warranties.[27] OSI cannot bypass the contractual Indemnification process, ignore the contractual requirement to prepare its Initial Modified Working Capital Statement using accounting principles consistent with those used in the Reference Statement, and then seek a gigantic Closing Adjustment by attempting to convince the Independent Accounting Firm that Instrumentarium's Reference Statement was materially inaccurate and infected by improper accounting. The process set forth in § 2.10(c) of the Purchase Agreement was not intended to be used to resolve such contentions, it was designed to handle disputes about the extent of change in Spacelabs's Modified Working Capital between June 30, 2003 (the "as of" date of the Reference Statement) and March 19, 2004 (the Closing Date) when measured under the same accounting principles used in preparing the Reference Statement.

## III. *Conclusion*

For all these reasons, I grant judgment on the pleadings for GE and against OSI. Any argument by OSI that the accounting principles used in the Reference Statement did not comply with GAAP should be heard in the Legal Arbitration process. The Legal Arbitration process should be completed first and the parties can work with the Legal Arbitrator, who has broad interpretative powers regarding the Purchase Agreement, to determine the issues that would then remain for determination in the Closing Adjustment Arbitration. Instrumentarium shall present a conforming final order, upon notice to OSI as to form. Each side shall bear its own costs.

---

tion and warranty was an action at law as provided for by the purchase agreement's indemnification provisions. The purchaser maintained that arbitration before an accountant was required under the agreement's valuation provisions. *Id.* at 669. The Court held that the purchaser was not entitled to submit the dispute to an accountant for arbitration because litigation was the dispute resolution mechanism the parties had bargained for in the event of breach of a representation or warranty. *Id.* at 671.

27. *See Westmoreland,* 763 N.Y.S.2d 525, 794 N.E.2d at 671.