# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 12585-VCL |
| WESTINGHOUSE ELECTRIC COMPANY LLC and WSW ACQUISITION CO., LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 7, 2016
Date Decided: December 5, 2016

David E. Ross, Garrett B. Moritz, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Jonathan M. Moses, Kevin S. Schwartz, Andrew J.H. Cheung, Cecilia A. Glass, Bita Assad, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Plaintiff Chicago Bridge & Iron Company N.V.*

Kevin G. Abrams, John M. Seaman, Daniel R. Ciarrocki, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Peter N. Wang, Yonaton Aronoff, Douglas S. Heffer, Alisha L. McCarthy, FOLEY & LARDNER LLP, New York, New York; *Attorneys for Defendants Westinghouse Electric Company LLC and WSW Acquisition Co., LLC*.

**LASTER, Vice Chancellor.**

Chicago Bridge & Iron Company N.V. (the "Seller") sold a subsidiary to an acquisition vehicle controlled by Westinghouse Electric Company LLC (the "Buyer"). The transaction was governed by a purchase agreement dated October 27, 2015 (the "Purchase Agreement" or "PA"). The purchase price consisted of $0 at closing, subject to (i) a post-closing purchase price adjustment and (ii) potential deferred consideration and earnout payments.

The Purchase Agreement contains a dispute resolution mechanism for resolving disagreements over the purchase price adjustment. The Seller started using the dispute resolution mechanism, then shifted course and filed this lawsuit. The Buyer has moved for judgment on the pleadings, arguing that the dispute resolution mechanism establishes a mandatory path for resolving the parties' disagreements. This decision grants the Buyer's motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the pleadings and the documents they incorporate by reference. The standard for a motion for judgment on the pleadings calls for drawing all reasonable inferences in favor of the non-movant. In this case, the standard has little practical effect, because the plain language of the Purchase Agreement controls.

### A.     The Parties Enter Into The Purchase Agreement.

The Buyer designs nuclear power plants. Through its former subsidiary, CB&I Stone & Webster, Inc. (the "Company"), the Seller built nuclear power plants.

In 2008, the Buyer and the Company were hired to design and build two nuclear power plants. During regulatory review, the Buyer was forced to make changes to the

1

design. The projects suffered delays and severe cost overruns, and disagreements arose over who bore responsibility. From 2012 through 2015, various participants in the projects litigated against each other over these issues.

In summer 2015, the Seller and the Buyer agreed to resolve their part of the dispute by having the Buyer acquire the Company. They memorialized their deal in the Purchase Agreement.

## B.     The Terms Of The Purchase Agreement

The Purchase Agreement provided for a purchase price at closing of $0, subject to a post-closing adjustment and with the prospect of deferred payments in the future. In exchange, the Buyer agreed to assume all of the Company's current and potential liabilities, including any liabilities that might arise from the cost overruns.

The purchase price provision was complex. Section 1.2(a) of the Purchase Agreement stated:

> (a)     The aggregate consideration for the purchase of the Transferred Equity Interests shall be an amount in cash equal to:
>
> (i)      (A) $0, less (B) the Closing Indebtedness Amount, (C) (x) if the amount of the Target Net Working Capital Amount exceeds the Net Working Capital Amount, less the amount by which the Target Net Working Capital Amount exceeds the Net Working Capital Amount and (y) if the Net Working Capital Amount exceeds the Target Net Working Capital Amount, plus the amount by which the Net Working Capital Amount exceeds the Target Net Working Capital Amount, less (D) the Company Transaction Expenses (the amount resulting from the calculation in this Section 1.2(a)(i), the "Closing Date Purchase Price"); plus
>
> (ii)     any Deferred Purchase Price that becomes due and payable to [the Seller] . . . ; plus
>
> (iii)    any Net Proceeds Earnout Amounts that become due and payable to [the Seller] . . . ; plus

2

(iv) any Milestone Payments that become due and payable to [the Seller] . . . (together with the Closing Date Purchase Price, Deferred Purchase Price and Net Proceeds Earnout Amounts, the "Aggregate Purchase Price").

PA § 1.2(a). Under this framework, the adjustments in Section 1.2(a)(i) affected the calculation of the purchase price as of closing and generated the Closing Date Purchase Price. The Deferred Purchase Price, the Net Proceeds Earnout Amounts, and the Milestone Payments constituted deferred consideration that might be received over time. For simplicity, this decision refers to the former as the "Closing Date Adjustment" and the latter as the "Earnout Amounts." These are labels of convenience and do not alter the treatment of the amounts under the Purchase Agreement.

The Purchase Agreement capped the Earnout Amounts. That cap was tied in part to the Closing Date Adjustment. *See* PA § 11.1 (definition of "Sharing Band," definition of "Net Proceeds Earnout Increase Amount"). The Purchase Agreement did not, however, cap the Closing Date Adjustment.

The magnitude of the Closing Date Adjustment could be quite large. The Purchase Agreement defined the Target Net Working Capital Amount as $1.174 billion. It then called for the purchase price to be adjusted based on the Net Working Capital Amount so that the Company would have that amount of cash on its books as of closing. Assuming the other elements of the formula remained constant, this meant that if the Net Working Capital Amount was less than the Target Net Working Capital Amount, the Seller had to pay the Buyer the difference. PA § 1.4(g). If the Net Working Capital Amount was zero, then the Seller would have to pay the Buyer $1.174 billion. But the calculation was

3

reciprocal, so if the Company had more cash on its books than the Target Net Working Capital Amount, then the Buyer would pay the difference to the Seller.

The Purchase Agreement implemented the resolution of the parties' disputes through a broad mutual release, which extends to "any and all rights, defenses, claims or causes of action . . . known and unknown, foreseen and unforeseen, arising prior to or on the Closing" that the parties had or "may have in the future" against one another. PA § 12.18. The mutual release does not "limit[] the rights of [the Buyer] or the Company . . . under [the Purchase] Agreement." *Id.*

The parties signed the Purchase Agreement on October 27, 2015. They agreed to a closing date of December 31, 2015. Between June 30, 2015 and closing, the Seller contributed approximately $1 billion to the Company to fund ongoing work on the projects.

## C.    The Closing Date Adjustment

As the closing approached, the Seller prepared the Closing Payment Statement, which had to include a "good faith estimate" of an "Estimated Closing Date Purchase Price." PA § 1.4(a). The Closing Payment Statement had to be prepared in accordance with generally accepted accounting principles ("GAAP") and a set of "Agreed Principles" identified in Schedule 11.1(a) to the Purchase Agreement. *Id.* § 1.4(f). On December 28, 2015, the Seller provided the Buyer with a Closing Payment Statement that included an Estimated Net Working Capital Amount of $1,601,805,000. The Seller's estimate exceeded the Target Net Working Capital Amount and suggested a payment from the Buyer to the Seller of approximately $428 million.

4

After closing, the Buyer was obligated to provide the Seller with a "Closing Statement" setting forth the Buyer's "good faith calculations" of the "Closing Date Purchase Price." PA § 1.4(b). The Closing Statement also had to be prepared in accordance with GAAP and the Agreed Principles. *Id.* § 1.4(f). On April 28, 2016, the Buyer presented the Seller with its Closing Statement. The Buyer calculated the Net Working Capital Amount at closing as *negative* $976,500,000. This figure was dramatically less than the Target Net Working Capital Amount and suggested a payment from the Seller to the Buyer of approximately $2.15 billion.

The wide gap stemmed from four changes that the Buyer made to the Seller's Closing Payment Statement. First, the Buyer reduced by 30% an outstanding receivable on the Company's balance sheet called the "claim cost." The claim cost asset represented "costs incurred and paid for by the Company for items that would be presented for recovery from either the project owners or the Buyer as a matter of contractual entitlement or as claims for overruns for which the Company was not responsible." Compl. ¶ 29. The Buyer asserted that the Seller's estimate of "100 percent collectability" violated GAAP.

Second, the Buyer adjusted the claim cost receivable to reflect the cost of the design changes that were mandated during regulatory review. The Buyer established a reserve for these costs and deducted the amount of the reserve from the Seller's Closing Payment Statement.

Third, the Buyer increased by 30% the estimates of the cost to complete the projects. The Buyer made this adjustment because it believed that the projects would cost $3.2 billion more to complete than the Seller had initially predicted.

5

Fourth, the Buyer claimed that the Seller had violated GAAP by omitting a liability of $432 million that related to the Seller's acquisition of the Company. The Buyer deducted this amount.

**D.      The Seller Disputes The Buyer's Closing Date Adjustment.**

Once the Buyer submitted the Closing Statement, the Seller had sixty days to raise any objections. If the Seller did not raise any timely objections, the Closing Statement would become "final, conclusive, binding and non-appealable." *Id.*

If submitted, the Seller's objections would trigger the dispute resolution mechanism in Section 1.4 of the Purchase Agreement. It required that the Buyer and the Seller negotiate for thirty days "in good faith" in an effort to resolve the objections. PA § 1.4(c). If the parties were unsuccessful, then either could submit to "[an] Independent Auditor for review and resolution in accordance with the terms and provisions hereof, any and all matters that remain in dispute with respect to the Objections Statement, the Closing Statement and the calculations set forth therein." *Id.* The Purchase Agreement provided that the determinations of the Independent Auditor were "final, conclusive, binding, non-appealable and incontestable by the parties hereto and each of their respective Affiliates and successors and permitted assigns, and . . . [shall] not be subject to dispute for any reason other than manifest error or fraud." *Id.*

The Purchase Agreement provided that if either party invoked the Independent Auditor process, then it became mandatory and the parties were required to "use their commercially reasonable best efforts to cause the Independent Auditor to resolve all such

6

disputes as soon as practicable . . . ." *Id.* Section 1.4(c) characterized the Independent Auditor as an "expert and not . . . an arbitrator." It further stated that

> [i]n resolving any disputed item, the Independent Auditor may not assign a value to any item greater than the highest value for such item claimed by either [the Buyer] or [the Seller] or less than the lowest value for such item claimed by either [the Buyer] or [the Seller]. The Independent Auditor's determinations shall be based solely on written submissions by [the Buyer] and [the Seller] that are in accordance with the applicable guidelines and procedures set forth herein . . . and on the definitions included herein.

*Id.* § 1.4(c).

After the Buyer presented the Seller with its Closing Statement on April 28, 2016, the Buyer and the Seller agreed to extend the Seller's sixty-day objections period. During that time, the Seller raised several objections to the Buyer's calculations. The Buyer and the Seller's discussions regarding the objections continued into the summer.

## E. This Litigation

On July 21, 2016, shortly before the expiration of the extension to the objections period, the Seller filed this action against the Buyer. The Seller's complaint asserts two counts for declaratory relief. Count I contends that the Buyer's calculation of the Closing Date Adjustment breached the express terms of the Purchase Agreement. Count II contends that the Buyer's calculation of the Closing Date Adjustment breached the implied covenant of good faith and fair dealing that inheres in the Purchase Agreement.

The gist of the Seller's theory is that other provisions in the Purchase Agreement foreclose the Buyer from making adjustments to items that appeared on the Company's balance sheet or adding liabilities with the avowed goal of complying with GAAP. The

7

Seller observes that in Section 2.6(a) of the Purchase Agreement, the Seller made the following representation:

> 2.6 Financial Statements.
>
> (a) [The Seller] has delivered to [the Buyer] the financial statements of the Company and its Subsidiaries (adjusted to reflect the Business) included as Schedule 2.6(a) of the Seller Disclosure Schedule (collectively, the "Financial Statements"). The Financial Statements have been prepared in accordance with GAAP, except as otherwise indicated and subject to normal and recurring year-end adjustments (which are not material to the Business) and the absence of footnotes. The Financial Statements fairly present, in all material respects, the financial position and results of operations of the Company and its consolidated Subsidiaries (adjusted to reflect the Business), as applicable, as of the dates, and for the periods, indicated therein.
>
> . . .
>
> (e) There are no Liabilities of the Company or any of its Subsidiaries, whether accrued, absolute, determined or contingent, except for (i) Liabilities disclosed and provided for in the balance sheets included in the Financial Statements, (ii) Liabilities incurred in accordance with or in connection with this Agreement, (iii) Liabilities incurred in the Ordinary Course of Business since June 30, 2015 and (iv) Liabilities that have not had and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. None of the Company or any of its Subsidiaries maintains any "off-balance sheet arrangement" within the meaning of Item 303 of Regulation S-K of the Securities and Exchange Commission.

PA § 2.6. In other words, the Seller represented that the Company's financial statements complied with GAAP and that the Company had no undisclosed liabilities.

The Seller next observes that in Section 10.1 of the Purchase Agreement, the parties agreed that the Seller's representations and warranties would not survive closing:

> . . . [N]one of the representations, warranties, covenants . . . or agreements set forth in this Agreement or any in any certificate, statement or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants or agreements, shall survive the Closing (and there shall be no liability for monetary damages

8

after the Closing in respect thereof); provided that this Section 10.1 shall not . . . relieve either party for liability in respect of actual fraud.

*Id.* § 10.1. The Seller contends that by agreeing to Section 10.1, the Buyer gave up its post-closing right to challenge any of the figures in its financial statements as non-GAAP compliant, whether that challenge takes the form of a claim for indemnification, a suit for breach of representations and warranties, or any other process. The Seller believes that the Buyer is attempting to circumvent this commitment through the Closing Date Adjustment.

The Buyer recognizes that it has taken the position that the Seller's estimates on the Closing Payment Statement were not GAAP compliant. It also recognizes that the Seller made the representations in Sections 2.6(a) and (e) and that the survival period for enforcing those representations has lapsed. But the Buyer insists that it did not give up its right to raise issues of GAAP compliance during the Closing Date Adjustment process. The Buyer contends that the Closing Date Adjustment is a separate mechanism that independently contemplates GAAP compliance. The Buyer cites Section 1.4(f) of the Purchase Agreement, which states:

> Each of the Closing Payment Statement and the Closing Statement shall be (i) in a format substantially similar to the sample calculation with respect to Net Working Capital Amount attached to this Agreement as Schedule 1.4(f), it being understood that in the event of an inconsistency between such illustrative calculation and the Agreed Principles, the Agreed Principles will prevail; (ii) prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods indicated and with the Agreed Principles; and (iii) consistent with the provisions of this Agreement relating to the parties' respective rights and obligations for the payment or reimbursement of costs and expenses.

9

*Id.* § 1.4(f). The Buyer responds to the Seller's contention about the no-survival provision in Section 10.1 by citing Section 10.3, which explicitly carved out and preserved the Closing Date Adjustment mechanism in Section 1.4(c). Section 10.3 states:

> This Article X shall not (i) operate to interfere with or impede the operation of the provisions of Section 1.4(c) providing for the resolution of certain disputes relating to the Final Purchase Price between the parties and/or by an Independent Auditor or (ii) limit the rights of the parties hereto to obtain an injunction or injunctions to prevent breaches of this Agreement, to enforce specifically the terms and provisions hereof or to obtain other equitable remedies with respect hereto.

*Id.* § 10.3.

The Buyer has moved for judgment on the pleadings. The Buyer contends that regardless of who is right about the disputes, they should be resolved by the Independent Auditor. The Buyer asks that judgment be entered in its favor so that the parties can proceed with the dispute resolution mechanism in the Purchase Agreement.

## II.     LEGAL ANALYSIS

A motion for judgment on the pleadings pursuant to Rule 12(c) will be granted "only when no material issue of fact exists and the movant is entitled to judgment as a matter of law." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993). "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party." *Id.* (citation omitted).

"Judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *Lillis v. AT&T*

*Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (citation and internal quotation marks omitted). An agreement is ambiguous if the "provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. v. Am. Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992). "If the contract's meaning is unambiguous, the court must grant judgment on the pleadings in favor of the moving party." *Lillis*, 904 A.2d at 330.

Two precedents deal with the scope of similar dispute resolution mechanisms and shed light on whether the Purchase Agreement is unambiguous. In *OSI Systems, Inc. v. Instrumentarioum Corp.*, 892 A.2d 1086 (Del. Ch. 2006), a seller provided a post-closing estimate of net working capital that was 3% below the target, and the buyer responded with a post-closing calculation of working capital that was 54% below the target. *Id.* at 1088–89. The difference between the statements depended on whether the seller's initial estimate was GAAP compliant. The parties disputed whether this was a question for an independent accountant to resolve under the purchase price adjustment provision or a claim for breach of a representation to be resolved under the agreement's indemnification framework.

Under the transaction agreement at issue in *OSI*, the seller was required to present a "Reference Statement" estimating net working capital. The buyer's subsequent calculation had to use calculations in accordance with "Transaction Accounting Principles" established by the agreement, "applied consistently with their application in . . . [the seller's] Reference Statement . . . ." *Id.* at 1087. The Transaction Accounting Principles required compliance with GAAP. *Id.* at 1093. The seller expressly represented in the agreement that the

11

Reference Statement was derived from financial statements that adhered to the Transaction Accounting Principles and hence complied with GAAP. *Id.* at 1092.

The transaction agreement provided that any claim for breach of the seller's representation regarding the GAAP compliance of the Reference Statement would be decided by arbitration. The transaction agreement provided that any dispute over the working capital calculations, however, would be decided using a dispute resolution mechanism involving an independent accountant. *Id.* at 1088.

Chief Justice Strine, then serving as a Vice Chancellor, construed the terms of the dispute resolution mechanism narrowly and held that the independent accountant had not been given authority to decide the question of GAAP compliance. Under the transaction agreement, the independent accountant was empowered only to make a "final determination, binding on the parties . . . , *of the appropriate amount of each of the line items* in the Initial Modified Working Capital Statement as to which [seller] and [buyer] disagree as set forth in the Notice of Disagreement." *Id.* at 1088 (emphasis added). Chief Justice Strine held that it would enlarge the independent accountant's role beyond the contractual delegation of authority to "involve[] the Independent Accounting Firm in an entirely different and more ambitious role: that of determining that the Transaction Accounting Principles used in the Reference Statement were not compliant with U.S. GAAP." *Id.* at 1091. In reaching this conclusion, he also noted that the representation regarding GAAP compliance extended to the Reference Statement, which brought the dispute over GAAP compliance within the scope of a claim for breach of a representation or warranty. *Id.* at 1092.

More recently, in *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, 2015 WL 1897659 (Del. Ch. Apr. 24, 2015), Chancellor Bouchard addressed a similar issue but under a transaction agreement that called for a different result. As in *OSI*, the *Alliant* transaction agreement contemplated a post-closing working capital adjustment pursuant to which the seller and the buyer would exchange GAAP-compliant estimates and calculations and any disputes would be resolved by an independent accountant. As in *OSI*, the seller represented that its financial statements were GAAP compliant. As in *OSI*, the buyer disputed in its calculations whether certain items on the seller's working capital estimate complied with GAAP. As in *OSI*, the seller argued that the buyer could not raise GAAP compliance as part of the working capital adjustment and had to seek a remedy for breach of representation. But unlike in *OSI*, the "sole remedy" provision in the *Alliant* agreement's breach of representation and warranty section stated that "nothing in this sentence shall operate to interfere with or impede the operation of the provisions of" the post-closing working capital adjustment procedure. *Id.* Also unlike *OSI*, the transaction agreement in *Alliant* contained a separate provision that required the working capital calculation to be GAAP compliant; it was not part of the representation and warranty regarding the seller's financial statements.

In light of this language, Chancellor Bouchard held that issues of GAAP compliance in connection with the purchase price adjustment should be resolved by the independent accountant charged with addressing disputes about the working capital adjustment. The Chancellor reasoned that so long as the seller used GAAP when submitting its good faith estimate, then the buyer was obligated to use the same GAAP-compliant method. *Id.* at *8.

13

But if the seller had not followed GAAP, then the buyer could put forward a GAAP-complaint calculation. *Id.* Chancellor Bouchard held that any other construction would require that the buyer use the seller's methodology, even if it did not comply with GAAP, thereby reading the words "calculated in accordance with GAAP" out of the definition of net working capital.

As in the current case, the *Alliant* agreement provided that the independent accountant would act "as an expert and not as an arbitrator." The seller argued that as in *OSI*, this meant that its determinations should be limited to "pure mathematics" and should not extend to determinations of GAAP compliance. Chancellor Bouchard rejected this argument. He observed that courts in Delaware and elsewhere had already interpreted the scope of similar provisions to encompass assessments of accounting methodology. *Id.* at *10 n.74 (collecting cases). He also reasoned that "little, if any, accounting expertise would be required simply to perform mathematical calculations," and that if the parties truly intended for the independent accountant to act as an "expert," then they necessarily contemplated that "the accounting firm will resolve the dispute as accountants do—by examining the corporate books and applying normal accounting principles plus any special definitions the parties have adopted . . . ." *Id.* at *10.

In reaching this outcome, Chancellor Bouchard considered the different holding in *OSI*. He distinguished that case based on the different contractual language in the *Alliant* agreement which carved out the post-closing adjustment procedure from the indemnification framework:

14

> The inclusion of [the carve-out] confirms that the parties contemplated that there could be circumstances in which a claim covered by the indemnification provisions in Article IX also could be the subject of a dispute under the Purchase Price Adjustment Procedure governed by Section 2.4. If that were not the case, there would have been no reason to include [the carve-out] in Section 9.5.

*Id.* at *9.

In this case, the Purchase Agreement tracks the *Alliant* agreement and contains language that distinguishes this case from *OSI*. As in *Alliant*, the Closing Date Adjustment provision requires that the Closing Payment Statement and the Closing Statement comply with GAAP. As in *Alliant* and unlike in *OSI*, the Seller's representation regarding the Company's financial statements being GAAP compliant did not encompass the Closing Payment Statement. As in *Alliant*, the dispute resolution mechanism for the Closing Date Adjustment provides that the Independent Auditor's authority extends to "any and all matters that remain in dispute with respect to the Objections Statement, the Closing Statement and the calculations set forth therein." This language is sufficiently broad to encompass determinations about GAAP compliance. The Purchase Agreement also contains a carve-out like the one found in *Alliant*. The survival provision that limits claims for breaches of representations and warranties states that it "shall not (i) operate to interfere with or impede the operation of the provisions of Section 1.4(c) providing for the resolution of certain disputes relating to the Final Purchase Price between the parties and/or by an Independent Auditor." The controlling precedent is therefore *Alliant*, not *OSI*.

In a final attempt to analogize this case to *OSI*, the Seller observes that the size of the adjustment is potentially quite large, noting that Chief Justice Strine relied on the size

of the dispute in *OSI* as one reason for holding that it should not be referred to the independent accountant. The Purchase Agreement in this case, however, contains specific language, absent from *OSI*, which establishes that the Independent Auditor has authority to determine GAAP compliance. Moreover, the parties recognized that size could be an issue for the price adjustments, and they expressly capped the Earnout Amounts. They chose not to cap the Closing Date Adjustment. The potential size of the adjustment is therefore not a reason to take the issue away from the Independent Auditor.

The plain language of the Purchase Agreement thus establishes that the parties' disputes over the Closing Date Adjustment are to be resolved by the Independent Auditor. Judgment on the pleadings is granted in favor of the Buyer on the Seller's claim for breach of the express provisions of the Purchase Agreement.

The Seller also has asserted a claim for breach of interstitial provisions to be found in the Purchase Agreement using the implied covenant of good faith and fair dealing. "The implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010). Because the Purchase Agreement addresses the matter, there is no gap for the implied covenant to fill. Judgment on the pleadings is granted in favor of the Buyer on the Seller's claim for breach of the implied covenant.

## III.     CONCLUSION

The Buyer's motion for judgment on the pleadings is granted. The parties' disputes over the Closing Date Adjustment are for the Independent Auditor to resolve.

16