# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CURRAX PHARMACEUTICALS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0122-MTZ |
| | ) | |
| OPTINOSE AS and | ) | |
| OPTINOSE, INC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted:  October 23, 2020
Date Decided:  January 22, 2021

Daniel A. O'Brien, VENABLE LLP, Wilmington, Delaware; Christopher P. Borello, Joshua D. Calabro, VENABLE LLP, New York, New York; *Attorneys for Plaintiff Currax Pharmaceuticals LLC*.

Daniel M. Silver, Benjamin A. Smyth, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Timothy P. McAnulty, Cara E. Regan, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C.; *Attorneys for Defendants OptiNose AS and OptiNose, Inc.*

**ZURN, Vice Chancellor.**

Cross motions for judgment on the pleadings present the Court with competing interpretations of a patent licensing agreement. That agreement grants the licensee an exclusive license in the licensor's patents to make and sell a certain drug in the United States, Canada, and Mexico. The agreement also divides control of the subject patents' prosecution. While the licensor retained the sole right to prosecute its "Platform Patents," the licensee gained the first right to prosecute the "Product Patents" subject to certain limitations and approval rights in favor of the licensor. The licensor also agreed to affirmatively transfer prosecution rights to the licensee. The parties disagree about the scope of the licensee's prosecution rights, what the licensor must do to "transfer" those rights, and the scope of the licensor's approval rights.

This dispute is inspired by the licensee's quest to file a terminal disclaimer on a Product Patent over another Product Patent, for which the licensee controls prosecution. The licensee has thus far been unable to file that terminal disclaimer because its limited authority before the United States Patent and Trademark Office, granted via an Authorization to Act, does not permit it to make that filing. The licensee cannot file its proposed terminal disclaimer without a power of attorney. To remedy this deficiency, the licensee seeks a power of attorney over the Product Patents from the licensor. The licensee argues that such a power of attorney is necessary to effectuate its prosecution rights. The licensor has refused, maintaining

1

that it has no such obligation under the agreement. The licensee brought this action seeking an order for specific performance requiring the licensor to grant the power of attorney.

This opinion concludes that the licensee's "prosecution" powers permit it to file terminal disclaimers, and that by agreeing to cooperate in transferring prosecution rights to the licensee, the licensor agreed to execute the power of attorney required for the licensee to implement those rights. Moreover, the licensor's approval rights do not reach filing a terminal disclaimer on a Product Patent over a Product Patent. For the reasons that follow, the licensee's motion is granted, and the licensor's motion is denied.

## I.    BACKGROUND[1]

Defendants OptiNose AS and OptiNose, Inc. (together, "OptiNose" or "Defendants") develop pharmaceutical products.[2] Among these products is a sumatriptan nasal powder known as ONZETRA® XSAIL® ("Onzetra"). Onzetra provides a 22mg dose, dry powder formulation of sumatriptan, administered via a

---

[1] On the parties' cross motions for judgment on the pleadings, I draw all facts from the pleadings and documents integral to them. Citations in the form of "Compl. ¶ —" refer to the plaintiff's complaint, available at Docket Item ("D.I.") 1. Citations in the form of "Answer ¶ —" refer to the defendants' answer to the complaint, and citations in the form "Countercl. ¶ —" refer to defendants' counterclaims; both are available at D.I. 11. Citations in the form "Countercl. Answer ¶ —" refer to plaintiff's answer to defendants' counterclaims, available at D.I. 17. Citations in the form of "Hrg. Tr. —" refer to the transcript of the October 23, 2020 hearing on the motions, available at D.I. 50.

[2] OptiNose, AS is OptiNose, Inc.'s wholly-owned Norwegian subsidiary.

breath powered exhalation delivery system. It is approved by the Food and Drug Administration for the acute treatment of migraine headaches in adults.

On September 25, 2019, OptiNose and Plaintiff Currax Pharmaceuticals LLC ("Currax" or "Plaintiff") entered into a licensing agreement (the "Agreement").[3] The Agreement gives Currax an exclusive license to, among other things, manufacture and sell Onzetra in the United States, Canada, and Mexico.[4] The Agreement divides OptiNose's patents embodied in Onzetra into "Product Patents" and "Platform Patents."[5] Currax acquired the first right to control prosecution of the "Product Patents,"[6] while OptiNose retained prosecution control over the "Platform Patents."[7]

Section 5.01(a)(i) of the Agreement describes Currax's prosecution rights for Product Patents:

---

[3] *See* Compl. Ex. A. [hereinafter "Agr."].

[4] *See id.* § 2.01(a)(i).

[5] The term "OptiNose Patents" is defined to include the patents listed in Schedule 1.01(b). *See id.* § 1.01(defining "OptiNose Patents"). Schedule 1.01(b) includes a list of patents that OptiNose controls and that are necessary to, among other things, make, sell, and import the Onzetra. *See id.* Sched. 1.01(b); *see also id.* § 6.02(a).

[6] *See id.* § 5.01(a)(i); *see also id.* Sched. 1.01(d) (listing the Product Patents).

[7] *See id.* § 5.01(a)(ii); *see also id.* Sched. 1.01(c) (listing the Platform Patents).

3

Currax shall have the first right to control the Prosecution and maintenance of the Product Patents in the Territory; provided that Currax shall provide copies to OptiNose of all communications with the applicable patent offices reasonably in advance of filing and OptiNose shall have the right to review and comment on such filings, which Currax shall reasonably consider; provided, further, that filings or statements in any filing relating to or characterizing the Device component of the Product or other OptiNose intellectual property shall require OptiNose's prior approval (such approval not to be unreasonably withheld, conditioned or delayed). If Currax determines to abandon or not maintain any Product Patent, then Currax shall notify OptiNose of such determination sufficiently in advance of any filing or response deadline (and in any event at least thirty (30) days in advance) and OptiNose shall then have the right (but not the obligation) to Prosecute and maintain such Product Patent in OptiNose's name, and the licenses granted to Currax set forth in Section 2.01(a)(i) will be terminated with respect to such Product Patent. If a Product Patent issues with claims that are listable for or Cover XHANCE® (fluticasone propionate), such Patent shall cease to be a Product Patent and shall thereafter be a Platform Patent. In such instance, Currax shall take actions in accordance with Section 5.01(c) to transfer Prosecution and maintenance of such Patent(s) to OptiNose.[8]

"Prosecution" as defined in the Agreement includes any ex parte proceeding before

the United States Patent and Trademark Office ("USPTO"):

> "**Prosecution**" means, with respect to the Territory, any ex parte procedure or practice before an administrative agency such as the [USPTO], or an equivalent agency, including but not limited to filing patent applications, prosecuting patent claims, reexaminations, reissues and the like. For the avoidance of doubt, Prosecution does not include post-grant reviews, inter partes reviews or oppositions.[9]

---

[8] *Id.* § 5.01(a)(i) (emphasis in original).

[9] *Id.* § 1.01 (defining "Prosecution").

4

Finally, Section 5.01(c)(i) requires OptiNose to "cooperate in transferring the right to Prosecute and maintain the Product Patents to Currax, including but not limited to executing any forms required to effect such transfer."[10] OptiNose has filed an "Authorization to Act" with the USPTO, which permits Currax's patent counsel to directly conduct certain aspects of the Product Patents' prosecution with the USPTO.[11]

During Currax's prosecution of the Product Patents, the USPTO rejected at least one pending Product Patent on double patenting grounds. As background, a pending patent may be rejected on double patenting grounds when it is similar to another patent owned by the same holder. "The doctrine of double patenting seeks to prevent the unjustified extension of patent exclusivity beyond the term of a patent."[12] One type of double patenting rejection, known as a "nonstatutory type" rejection, is "primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent."[13] A double patenting rejection may be overcome by filing a terminal

---

[10] *See id.* § 5.01(c)(i).

[11] OptiNose maintains that it was not obligated to file an Authorization to Act under the Agreement. *See* Countercl. ¶ 24.

[12] *See* MPEP § 804 (9th ed. Rev. Oct. 2019).

[13] *See id.*

disclaimer.[14]  A terminal disclaimer permits an applicant to disclaim (or dedicate to the public) the portion of the second patent's term that extends beyond the original patent's term.[15]  In effect, "the inventor agrees that both patents will expire on the same day."[16]  This prevents the patent holder from unfairly extending the term of the original patent with similar, later-filed patents.

To overcome the double patenting rejection, Currax seeks to file a terminal disclaimer.[17]  Both the patent for which Currax would like to file a terminal disclaimer and the patent over which it would be disclaimed are Product Patents.[18]  But the Authorization to Act before the USPTO does not permit Currax to "file a statutory or terminal disclaimer, [or] file a Power of Attorney (or other document requiring the signature of the applicant, assignee of the entire interest, or attorney of record)."[19]  This limitation precludes Currax from filing its desired terminal disclaimer.

To remedy this issue, Currax asked OptiNose for a power of attorney to enable filing the terminal disclaimer.  Currax contends that a power of attorney is required

---

[14] *See id.*; *see also* Answer ¶ 20.

[15] *See* MPEP § 1490.

[16] *Terminal Disclaimer*, *Black's Law Dictionary* (11th ed. 2019).

[17] *See* Compl. ¶¶ 19–20.

[18] *See* Hrg. Tr. 14:13–18.

[19] *See* Countercl. ¶ 10.

for Currax to exercise its prosecution powers under Section 5.01(a)(i), and so OptiNose must execute a power of attorney as part of its obligation to transfer prosecution rights to Currax. OptiNose refused Currax's request for a power of attorney, contending the Agreement does not compel one. Power of attorney is not specifically discussed in the Agreement.

In response to OptiNose's refusal, Currax filed its complaint in this action (the "Complaint") on February 24, 2020. The Complaint alleges that OptiNose breached the Agreement by refusing to grant Currax a power of attorney and asserts a single count for specific performance. OptiNose answered the Complaint on April 10 (the "Answer"). OptiNose also counterclaimed, seeking a declaration that the Agreement did not oblige OptiNose to grant Currax a power of attorney. Currax answered the counterclaim on May 8.

On May 1, OptiNose filed a motion for judgment on the pleadings seeking favorable resolution of its declaratory judgment claim ("OptiNose's Motion"). OptiNose argues that under the Agreement, Currax is not entitled to file terminal disclaimers without OptiNose's prior approval. It also contests Currax's construction of its "Prosecution" powers, claiming that power does not include filing terminal disclaimers. If the Agreement does permit Currax to file a terminal disclaimer, OptiNose submits that OptiNose can fill out the necessary paperwork, rather than granting power of attorney to Currax.

7

On May 12, Currax cross-moved for judgment on the pleadings ("Currax's Motion," and together, with OptiNose's Motion, the "Motions"). Currax's Motion argues that filing terminal disclaimers is part of Currax's "Prosecution" rights under the Agreement. According to Currax, a power of attorney is necessary for it to file such a terminal disclaimer, so OptiNose must execute one. The parties briefed the Motions, and the Court held oral argument on October 23.

## II. ANALYSIS

The standard for a motion for judgment on the pleadings is familiar.

> [A] trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party. The court must take the well-pleaded facts alleged in the complaint as admitted. A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[20]

Where, as here, there are cross-motions for judgment on the pleadings, "the court must accept as true all of the non-moving party's well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party. The court also may consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference."[21]

Currax's Motion seeks specific performance of the License Agreement.

---

[20] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (citations and footnotes omitted).

[21] *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006).

A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties. Its purpose is to place the aggrieved party in the position that it would have been in but for the breach. Specific performance is a matter of grace that rests in the sound discretion of the court. Its proponent must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.[22]

The proper interpretation of a contract is a question of law, and so judgment on the pleadings is a proper framework to enforce unambiguous contracts.[23]

In interpreting contracts, Delaware courts aim to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[24] "Delaware adheres to the 'objective' theory of contracts, [meaning that] a contract's construction should be

---

[22] *QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *11 (Del. Ch. Aug. 28, 2018) (alterations, footnotes, and internal quotation marks omitted) (collecting and quoting cases).

[23] *OSI Sys., Inc.*, 892 A.2d at 1090; *accord Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) ("[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact. . . . If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must grant judgment on the pleadings in favor of the moving party." (internal quotation marks omitted)).

[24] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)); *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 2019 WL 1068183, at *8 (Del. Mar. 7, 2019) ("To determine what contractual parties intended, Delaware courts start with the text.").

that which would be understood by an objective, reasonable third party."[25]  In doing so, the Court will "give effect to the plain-meaning of the contract's terms and provisions,"[26] "will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[27]  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[28]

"Under basic principles of Delaware contract law, and consistent with Delaware's pro-contractarian policy, a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table."[29]  Delaware law presumes parties are bound by the language of the agreement they negotiated, especially when the parties are sophisticated entities that have engaged in arms-

---

[25] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[26] *Id.* at 1159–60; *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) ("When interpreting a contract, a court must give effect to all of the terms of the instrument and read it in a way that, if possible, reconciles all of its provisions.").

[27] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[28] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[29] *GRT, Inc.*, 2012 WL 2356489, at *7.

length negotiations.[30]  "[A] contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms."[31]

Because Currax can satisfy each element of specific performance, its Motion is granted.  Currax has established that power of attorney is necessary for it to exercise its contractual right to file terminal disclaimers.  And so, OptiNose's Motion, which seeks a declaration to the contrary, is denied.

### A. The Parties Entered Into An Enforceable Contract Which Requires OptiNose To Provide Currax With A Power Of Attorney.

The first element of specific performance is the existence of a valid contract. The Agreement is undisputedly enforceable, supported by consideration, and unambiguous.[32] The parties disagree on what the Agreement's language means, and, more specifically, whether OptiNose must grant Currax a power of attorney so that Currax can file a terminal disclaimer.  Section 5.01(a)(i) of the Agreement grants

---

[30] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 391 (Del. 2009).

[31] *Osborn*, 991 A.2d at 1159 (Del. 2010) (quoting *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006)).

[32] *See* D.I. 32 at 1, 9; D.I. 29 at 1; *see also Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006) ("Three elements are necessary to prove the existence of an enforceable contract: 1) the intent of the parties to be bound by it, 2) sufficiently definite terms and 3) consideration.").

11

Currax "the first right to control the Prosecution and maintenance of the Product Patents in the Territory."[33] In support of this right, OptiNose is required to "cooperate in transferring the right to Prosecute and maintain the Product Patents to Currax, including but not limited to executing any forms required to effect such transfer."[34] This language poses two questions. First, is filing a terminal disclaimer part of Currax's "first right to control the Prosecution" of the Product Patents?[35] And if it is, is a power of attorney required to transfer that right?[36] I conclude that Currax has the right to file terminal disclaimers on the Product Patents; that it needs a power of attorney to file them; and that it is therefore entitled to a power of attorney for that purpose.[37]

---

[33] Agr. § 5.01(a)(i).

[34] *Id.* § 5.01(c)(i).

[35] *See id.* § 5.01(a)(i). Section 5.01(a)(i) gives Currax the "*first* right of Prosecution" for the Product Patents, while Section 5.01(a)(ii) gives OptiNose the "*sole* right of Prosecution" for the Platform Patents. *Compare id.* § 5.01(a)(i), *with id.* § 5.01(a)(ii). This difference is sensible, given that Currax's rights under Section 5.01(a)(i) are subject to OptiNose's right to "review and comment" on Currax's filings, and OptiNose's right to veto certain filings that relate to "other OptiNose intellectual property." *See id.* § 5.01(a)(i). Those limitations are discussed *infra.* In any case, the fact that Currax has the "first" right of Prosecution, as opposed to the "sole" right of Prosecution, does not bear on whether "Prosecution" includes filing terminal disclaimers or whether power of attorney is necessary to do so.

[36] *See id.* § 5.01(c)(i).

[37] In its Complaint, Currax offers several possible uses it may have for a power of attorney, including some that are unrelated to filing a terminal disclaimer. *See* Compl. ¶¶ 21–23. In briefing and at argument, the parties focused exclusively on Currax's use of a power of attorney to file a terminal disclaimer. *See, e.g.*, D.I. 29 at 11 ("Currax's demand for Power of Attorney centers around its desire to unilaterally file terminal disclaimers in pending Product Patent applications."). I follow the parties' lead, and answer the discrete question

### 1. Power Of Attorney Is Necessary For Currax To Exercise Its "Prosecution" Rights, Which Include Filing Terminal Disclaimers.

By its plain meaning, the definition of "Prosecution" includes filing a terminal disclaimer in Currax's "Prosecution" rights. The definition refers to "any" ex parte proceeding before the USPTO.[38] That filing a terminal disclaimer is an ex parte proceeding is not meaningfully in dispute. While OptiNose "does not concede" this point, it does not suggest an interpretation of the definition of "Prosecution" that would exclude filing terminal disclaimers, nor does it argue that filing a terminal disclaimer is not an ex parte proceeding.[39] Indeed, the definition supports categorizing terminal disclaimers as ex parte proceedings. The definition of "Prosecution" explicitly recognizes that prosecuting a patent is an ex parte proceeding.[40] Patent applicants generally file terminal disclaimers during prosecution, in response to and to overcome a double-patenting rejection.[41] Based

---

of whether the Agreement entitles Currax to a power of attorney so that it may file a terminal disclaimer of a Product Patent over a Product Patent. And so, I do not pass on the other possible uses suggested in the Complaint. As I explain *infra*, Currax is still bound by its other promises in the Agreement, and cannot use power of attorney in a way that would breach them.

[38] *See* Agr. § 1.01 (defining "Prosecution").

[39] *See* D.I. 29 at 19 & n.7.

[40] Agr. § 1.01 (defining "Prosecution" as "any ex parte procedure . . . including but not limited to . . . prosecuting patent claims").

[41] *E.g.*, *Ex Parte Mark T. Dinsmore & David J. Caruso*, 2013 WL 5274029, at *2 (P.A.T.B. June 3, 2013) ("During prosecution of Application . . . the Examiner rejected original application claims . . . on the ground of non-statutory obviousness-type double patenting

on the plain language in the Agreement's definition of "Prosecution," I construe that term to include filing terminal disclaimers.

Accordingly, because "Prosecution" includes filing terminal disclaimers, Section 5.01(c)(i) requires OptiNose to "cooperate in transferring the right to [file terminal disclaimers on the Product Patents] to Currax, including but not limited to executing any forms required to effect such transfer."[42] OptiNose suggests that rather than giving Currax a power of attorney, OptiNose can satisfy its obligations by filing the terminal disclaimer itself.[43] This suggestion does not comport with the plain language of the Agreement. Section 5.01(c)(ii) requires OptiNose to "cooperate in transferring" the Prosecution rights to Currax,[44] not to implement Currax's prosecution decisions. OptiNose must "transfer" the right to file a terminal disclaimer to Currax, not make that filing itself.

The next question is whether a power of attorney is "required to effect such transfer"[45] of Prosecution rights to Currax; in other words, whether power of attorney is necessary for Currax to file a terminal disclaimer on a Product Patent.[46] This

---

. . . . In response, Appellants filed a terminal disclaimer . . . ."), *aff'd sub nom. In re Dinsmore*, 757 F.3d 1343 (Fed. Cir. 2014).

[42] *See* Agr. § 5.01(c)(i).

[43] *See, e.g.*, D.I. 36 at 16.

[44] *See* Agr. § 5.01(c)(i).

[45] *Id.*

[46] *See id.* OptiNose has suggested that "'power of attorney' cannot be read into 'forms.'" *See* D.I. 29 at 21. It appears that executing a power of attorney would require OptiNose to

appears to be a settled question under federal law. The Code of Federal Regulations outlines the method for filing a terminal disclaimer.

> An applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of a patent to be granted. Such terminal disclaimer is binding upon the grantee and its successors or assigns. The terminal disclaimer, to be recorded in the Patent and Trademark Office, must: (1) Be signed by the applicant or an attorney or agent of record[.][47]

In implementing this language, the United States Court of Appeals for the Federal Circuit found that:

> The [USPTO] has . . . clearly articulated in its regulations that, other than the patentee, only the attorney of record with power of attorney is authorized to file a terminal disclaimer on the patentee's behalf.[48]

Other persuasive authority also suggests that power of attorney is necessary to file a terminal disclaimer. The USPTO's guide for electronically filing terminal disclaimers states that "[i]f the filer is an attorney or agent, the filer must have power

---

file a form with the USPTO. *See* MPEP § 402.02. More importantly, the relevant language in Section 5.01(c)(i) does not limit OptiNose's obligations to filling out forms; rather, it obliges OptiNose to cooperate broadly, "including but not limited to executing any forms required to effect such transfer." Agr. § 5.01(c)(i). And so, the relevant question is whether a power of attorney is "required to effect such transfer" of Prosecution rights, not whether it is a "form." *See id.*

[47] 37 C.F.R. § 1.321(b)(1) (2021); *see also id.* § 1.321(c)(2).

[48] *Japanese Found. for Cancer Research v. Lee*, 773 F.3d 1300, 1309 (Fed. Cir. 2014) (citing 37 C.F.R. § 1.32).

of attorney over the entered application number."[49]   Based on the foregoing, I conclude that Currax needs a power of attorney from OptiNose to file a terminal disclaimer.

### 2. None Of The Agreement's Restrictions Preclude Currax From Filing Its Proposed Terminal Disclaimer.

OptiNose cites several restrictions on Currax's rights vis-à-vis the Product Patents to argue Currax is precluded from filing terminal disclaimers or from receiving a power of attorney.  None of these restrictions operate as OptiNose suggests.  First, OptiNose argues that Currax is prohibited from abandoning Product Patent applications, and therefore is prohibited from filing a terminal disclaimer. The relevant language provides:

> If Currax determines to abandon or not maintain any Product Patent, then Currax shall notify OptiNose of such determination sufficiently in advance of any filing or response deadline (and in any event at least thirty (30) days in advance) and OptiNose shall then have the right (but not the obligation) to Prosecute and maintain such Product Patent in OptiNose's name, and the licenses granted to Currax set forth in Section 2.01(a)(i) will be terminated with respect to such Product Patent.[50]

---

[49] *See EFS-Web eTerminal Disclaimer*, *U.S. Pat. & Trademark Off.*, https://www.uspto.gov/sites/default/files/patents/process/file/efs/guidance/eTD-QSG.pdf (last visited Jan. 16, 2021).

[50] Agr. § 5.01(a)(i).

OptiNose contends that "[t]erminal disclaimers . . . abandon a portion of a patent's term."[51]

Even accepting that a terminal disclaimer "abandons" part of the patent's term, a terminal disclaimer does not trigger the Agreement's prohibition on unilateral abandonment of a Product Patent. When a patent applicant files a terminal disclaimer, she disclaims a portion of the patent's term to overcome a double-patenting rejection.[52] By doing so, she allows the patent application to continue, rather than changing the patent's scope or abandoning the application. While a portion of the patent's term may be abandoned, the patent itself is not. In addition, the term "abandonment" is a patent law term of art; abandoning a patent application is outlined in detail in the Code of Federal Regulations.[53] Filing a terminal disclaimer does not constitute statutory abandonment, and, in fact, is part of the procedure for reviving some inadvertently abandoned patents.[54]

Addressing OptiNose's second counterargument requires a bit more discussion. OptiNose cites its right to approve certain Product Patent filings and argues Currax cannot file a terminal disclaimer without triggering this provision. The relevant language states:

---

[51] D.I. 29 at 16.

[52] *See supra* notes 12–16 and accompanying text.

[53] *See* MPEP § 711; *see also* 37 C.F.R. §§ 1.135, 1.138.

[54] *See* MPEP § 711.03(c); *see also* 37 C.F.R. § 1.137(b)(3).

Currax shall have the first right to control the Prosecution and maintenance of the Product Patents in the Territory; . . . <u>provided, further</u>, that ***filings or statements in any filing relating to or characterizing the Device component of the Product or other OptiNose intellectual property shall require OptiNose's prior approval*** (such approval not to be unreasonably withheld, conditioned or delayed).[55]

To trigger OptiNose's approval right, Currax's terminal disclaimer must "relat[e] to or characteriz[e] the Device component of the Product or other OptiNose intellectual property."[56] A tour through the Agreement reveals that the "Device component of the Product" is a tangible component of the Onzetra product, and that "other OptiNose intellectual property" is intellectual property other than Product Patents. Currax's terminal disclaimer relating to two Product Patents,[57] which does not relate to or characterize any tangible part of the Onzetra product, does not trigger OptiNose's approval right.

First, "Device component of the Product" is a tangible object. The Agreement defines the "Product" as Onzetra itself.[58] It defines a "Device" as "a device or

---

[55] Agr. § 5.01(a)(i) (underline in original) (bold and italics added).

[56] *See id.*

[57] *See* Hrg. Tr. 14:13–18. In its brief, OptiNose raised the possibility that Currax could use power of attorney to make terminal disclaimers "relative to Platform Patents or other OptiNose intellectual property, not just other Product Patents." D.I. 36 at 10. This concern is not warranted because, as OptiNose's counsel conceded at argument, the terminal disclaimer at issue here involves only Product Patents. *See* Hrg. Tr. 14:13–18. Moreover, Currax's Prosecution rights are limited to Product Patents.

[58] *See* Agr. § 1.01 ("'**Product**' or '**Products**' means (a) the pharmaceutical product known as [Onzetra], marketed in the United States under NDA No. 206099, including any present or future supplements or amendments thereto, provided that such supplements or

component thereof incorporating the OptiNose Patents or other intellectual property rights owned or Controlled by OptiNose."[59] The plain meaning of the definition of "Device"—an object incorporating intellectual property—means "Device" must be a physical component of a product, not intellectual property. Other uses of the phrase "Device component of the Product" in the Agreement also refer to something tangible, not intellectual property.[60] I conclude that the "Device component of the Product" is a tangible component of the Onzetra product. Where, as here, a terminal disclaimer does not relate to or characterize a tangible component of the Onzetra product, it does not relate to or characterize the "Device component of the Product" and does not pull that trigger on OptiNose's approval right.[61]

amendments are limited to the administration of only one active ingredient, sumatriptan, to treat migraine headaches, and (b) any future products for the administration of only one active ingredient, sumatriptan, to treat migraine headaches that correspond to [Onzetra] in Canada and Mexico." (emphasis in original)).

[59] *See id.* (defining "Device").

[60] *See, e.g.*, *id.* § 4.02(b)(i) (requiring Currax to "report to OptiNose any defect, problem, adverse condition or potentially medical device reportable event to the extent relating to or arising from the Device component of the Product within five (5) Business Days of Currax becoming aware of such event"); *id.* § 4.04 ("The Parties shall cooperate on the supply by Currax or its designee to OptiNose or its designees of a limited supply of the Product or the Device component of the Product for noncommercial uses."); *see also JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) ("[T]he presumption of consistent usage, which provides that absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract." (internal quotation marks omitted)).

[61] *See* Agr. § 5.01(a)(i).

OptiNose's approval right can also be triggered by a terminal disclaimer that "relat[es] to or characteriz[es]" "other OptiNose intellectual property."[62] The parties dispute the meaning of "other OptiNose intellectual property." "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[63] By its plain meaning, "other" refers to something "distinct from that or those first mentioned or implied."[64] The only mentioned OptiNose intellectual property in the sentence is the Product Patents.[65] An elided version of the provision makes clear that "other OptiNose intellectual property" is OptiNose intellectual property other than the Product Patents: "Currax shall have the first right to control the Prosecution and maintenance of the Product Patents in the Territory; . . . provided, further, that filings or statements in any filing relating to or characterizing . . . other OptiNose intellectual property shall require OptiNose's prior approval."[66] Under the plain meaning of this provision, Currax triggers

---

[62] *See id.*

[63] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

[64] *See Other*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/other (last visited Jan. 17, 2021) (defining "other" as "[(a)] being the one (as of two or more) remaining or not included . . . [(b)] being the one or ones distinct from that or those first mentioned or implied").

[65] *See* Agr. § 5.01(a)(i). As discussed above, the "Device component of the Product" is not a subset of OptiNose's intellectual property, but a tangible device.

[66] *Id.* (emphasis omitted).

OptiNose's approval right by making a statement relating to or characterizing OptiNose intellectual property other than Product Patents.

This construction is in harmony with the rest of the Agreement, and, in fact, is the only way to give meaning to Currax's Product Patent prosecution rights. Currax necessarily makes filings "relating to or characterizing" the Product Patents when it prosecutes them, which is its right.[67]  The Agreement allows OptiNose to "review and comment" on Currax's correspondence with the USPTO and requires Currax only to "reasonably consider" OptiNose's comments.[68]  If "other OptiNose intellectual property" included the Product Patents, then OptiNose would have approval rights over Currax's Product Patent prosecution decisions.   And if OptiNose could veto any filing relating to the Product Patents, its comments would be binding, rather than suggestive.  This paradigm would cut a swathe through Currax's "first right to control" the Product Patents' Prosecution, on which OptiNose may only "review and comment."[69]  Indeed, granting OptiNose an approval right over Product Patent prosecution would improperly render the Product Patent's

---

[67] *See id.*  Even typical patent prosecution, outside of filing terminal disclaimers, requires Currax to make filings broadly "relating to" the Product Patents.  *See Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1150 (Del. Ch. 2006) (characterizing the phrase "related to" in an arbitration clause as a "broad term").

[68] *See* Agr. § 5.01(a)(i).

[69] *See id.*

"review and comment" process superfluous.[70]  Limiting OptiNose's approval right to its intellectual property squares with the overall structure of the Agreement: Currax controls the Product Patents' Prosecution, and OptiNose controls Prosecution for its other patents.  Based on this construction, I find that OptiNose's approval right is not triggered when Currax files a terminal disclaimer that is both on a Product Patent and over a Product Patent.

In conclusion, Currax's "first right to control the Prosecution and maintenance of the Product Patents"[71] includes the authority to file terminal disclaimers on the Product Patents.[72]  OptiNose has agreed to "cooperate in transferring the right to Prosecute and maintain the Product Patents to Currax," and promised to do whatever is "required to effect such transfer."[73]  Because filing a terminal disclaimer requires a power of attorney, OptiNose must grant this authority to Currax.  And because the proposed terminal disclaimer only involves Product Patents, it does not trigger OptiNose's approval rights.[74]  By granting Currax the right to walk through a locked door, and by agreeing to "transfer the right" to do so, OptiNose necessarily agreed

---

[70]*See Kuhn Constr.*, 990 A.2d at 396–97 (stating that Delaware Courts "will give each provision and term effect, so as not to render any part of the contract mere surplusage").

[71] Agr. § 5.01(a)(i).

[72] *See id.* § 1.01 (defining "Prosecution").

[73] *See id.* § 5.01(c)(i).

[74] *See id.* § 5.01(a)(i).

to give Currax the key to unlock that door.  Without the key, Currax's Prosecution rights would be meaningless.

## B. Currax Has Performed Its Obligations Under The Agreement.

A decree of specific performance requires that the party requesting it be "ready, willing, and able to perform."[75]  This element is not meaningfully in dispute. Currax has already performed its chief obligation:  the payment of an upfront licensing fee.[76] OptiNose makes no other allegations that Currax is otherwise unable or unwilling to perform any other obligations.

## C. The Balance Of The Equities Favors Currax.

Finally, the balance of the equities in this case favor enforcement of the Agreement.  "When balancing the equities [the court] must be convinced that specific enforcement of a validly formed contract would not cause even greater harm than it would prevent."[77]

OptiNose argues that power of attorney would grant Currax more authority than the Agreement contemplates, empowering it to breach the Agreement and potentially causing greater harm.  It is true that power of attorney would permit Currax to exercise some authority that the Agreement prohibits.  But this fact is not

---

[75] *QC Hldgs.*, 2018 WL 4091721, at *11.

[76] *See* Answer ¶ 16.

[77] *Osborn*, 991 A.2d at 1161 (alterations and internal quotation marks omitted).

23

fatal to Currax's case. Even armed with a power of attorney, Currax may only wield it as permitted by the terms of the Agreement. Granting Currax a power of attorney so that it can file a terminal disclaimer does not excuse Currax from keeping its other promises in the Agreement. That power of attorney would empower a breach does not make it any less necessary for Currax to carry out its Prosecution rights. As OptiNose's counsel acknowledged at argument, Currax's current authority under the Authorization to Act also empowers Currax to breach the Agreement.[78]

A power of attorney is a key that can open many doors. Some, such as filing terminal disclaimers, are permitted by the Agreement; some are not. Currax's agreement not to open those forbidden doors is not changed by the fact that it now has the key. Those same limitations continue to apply in full force. Just as the Agreement constrained Currax to use its Authorization to Act only for permitted purposes, it also limits how Currax may wield its power of attorney.

## III. CONCLUSION

For the foregoing reasons, Currax's Motion is **GRANTED**. For the same reasons, OptiNose's Motion is **DENIED**.

---

[78] *See* Hrg. Tr. 53:9–54:8.