# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PORTFOLIO BI, INC., | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0341-SKR |
| | ) | |
| MARKO DJUKIC and SHAILASH SANGHRAJKA, | ) | |
| | ) | |
| Defendants and Counterclaim Plaintiffs. | ) | |

Submitted: November 20, 2023
Decided: February 29, 2024

## MEMORANDUM OPINION

*Upon Consideration of Defendants and Counterclaim Plaintiffs' Motion for Judgment on the Pleadings:*

## DENIED

Ryan D. Stottman, Esquire, and Grant E. Michl, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Andrew Stewart, Esquire, and Erik Lund, Esquire, WHITESTONE LAW, PLLC, Reston, Virginia, for Plaintiff and Counterclaim Defendant Portfolio BI, Inc.

Theodore A. Kittila, Esquire, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware, and Jeffrey M. Greilsheimer, Esquire, HALLORAN FARKAS + KITTILA LLP, New York, New York, for Defendants and Counterclaim Plaintiffs Marko Djukic and Shailash Sanghrajka.

**RENNIE, J.**

This case arises from a dispute between the buyer and sellers of a financial technology company. The buyer sued the sellers for breach of contract and fraud, alleging that the sellers concealed that a high dollar value client of the acquired company planned to scale back or terminate its business relationship. The seller-defendants moved for judgment on the pleadings asserting that they are entitled to judgment as a matter of law based on alleged defects in the buyer-plaintiff's complaint. The seller-defendants have not established that they are entitled to judgment on the pleadings pursuant to Court of Chancery Rule 12(c), so the court will deny the motion.

## FACTUAL AND PROCEDURAL OVERVIEW[1]

Portfolio BI, Inc. ("Portfolio"), is a Delaware corporation with a principal place of business in New York, New York. Portfolio is in business to provide buy-side investment support services.

Hentsu Ltd. ("Hentsu") was in business to provide hedge fund and asset management technology. Marko Djukic ("Djukic"), a United States citizen who resides in New York, was the founder and chief executive officer of Hentsu. Shailash Sanghrajka ("Sanghrajka"), a United Kingdom citizen who resides in

---

[1] Unless otherwise noted, the facts described in this section are taken from Portfolio's Complaint and attached exhibits.

Middlesex, was the chief operating officer of Hentsu. Portfolio sought to purchase Hentsu from Djukic and Sanghrajka (the "Sellers").

As part of its due diligence review in purchasing Hentsu, Djukic, in January 2021, provided Portfolio a client tracker spreadsheet. The spreadsheet described the status of Hentsu's various client relationships as having "no risk", a "medium risk", or a "high risk" of termination or reduction. The spreadsheet listed Hentsu's relationship with client Duality Group ("Duality") as "no-risk."

On February 22, 2021, Portfolio and the Sellers entered into a Stock Purchase Agreement (the "SPA"), by which the Sellers sold ownership of Hentsu to Portfolio. In SPA § 3.03(a) (the "Material Customer Representation"), Hentsu represented and warranted that:

> No Material Customer has ceased doing business with the Company and the Company has not received, from any Material Customer, notice (i) cancelling, suspending, terminating, or stating the intent to terminate, such Material Customer's relationship with the Company, (ii) indicating that such Material Customer intends to reduce its purchase of services from the Company from the levels achieved during the 12-month period ending on December 31, 2020 or (iii) indicating that it will adversely alter the terms upon which it is willing to do business with the Company.[2]

On October 12, 2021, a Portfolio employee, who had worked at Hentsu prior to the sale, emailed Portfolio management. The employee stated that Duality had

---

[2] A Company Disclosure Letter (the "Disclosure Letter") is attached to the SPA as Exhibit E. Disclosure Letter § 3.03(a) lists the "Material Customers" as Hentsu's fifteen largest customers by dollar value in 2020. Duality is the highest dollar value Material Customer on that list.

incrementally withdrawn from its relationship with Hentsu from 2019 to 2021 and that Duality had always been considered a high-risk client for Hentsu. Then, in December 2021, Duality notified Portfolio that it planned to terminate or reduce its client relationship with Hentsu.[3]

Accordingly, in December 2021 and February 2022, Portfolio claimed that Djukic breached the SPA and demanded indemnification. Djukic did not accede to this demand.

On March 20, 2023, Portfolio filed suit against the Sellers and asserted claims for breach of contract and fraud. Portfolio alleges that the Sellers breached the Material Customer Representation by knowingly failing to disclose, before the execution of the SPA, that Duality intended to cut back or terminate its business relationship with Hentsu.[4] Further, Portfolio asserts that Djukic falsely represented the status of Duality's client relationship with Hentsu in order to induce Portfolio to enter into the SPA.[5]

On June 3, 2023, the Sellers filed an answer and counterclaim where they assert a claim for declaratory relief and indemnification.[6] In the counterclaim, the

___

[3] Specifically, on December 2, 2021, a Duality representative emailed a Portfolio representative stating that Duality began efforts to bring services like those Hentsu provides in-house in 2019 and increased these efforts over 2019 to 2021. Compl. Ex. E.

[4] Accordingly, Portfolio requests an order of specific performance that requires Djukic to cause the full amount of funds that was set aside for indemnification to be released to Portfolio.

[5] Compl.

[6] Defs.' Answer & Verified Countercl.

4

Sellers posit that they, not Portfolio, are the proper recipients of the funds that have been set aside for indemnification and that the SPA requires Portfolio to indemnify the Sellers for all costs and expenses from this litigation.[7] On June 22, 2023, Portfolio filed its answer to the counterclaim.[8]

On July 3, 2023, the Sellers filed a motion for judgment on the pleadings (the "Motion"). The Sellers argue that Portfolio's claims should be dismissed as a matter of law because (1) the claims are improperly based on extra-contractual statements; (2) Portfolio cannot recover because it is relying on an improper interpretation of the term "notice" in the Material Customer Representation; (3) Portfolio failed to plead fraud with particularity; and (4) Portfolio failed to state claims for breach of contract.[9]

On August 15, 2023, Portfolio filed a brief in opposition to the Motion. Portfolio argues that its claims should not be dismissed because (1) the term "notice" in the Material Customer Representation is general and does not require a formal writing; (2) Portfolio's claims are not based on extra-contractual evidence; and (3)

---

[7] *Id.* 48-50.
[8] Countercl. Def.'s Reply Verified Countercl.
[9] Opening Br. Supp. Defs. Marko Djukic & Shailask [sic] Sanghrajka's Mot. J. Pleadings [hereinafter "Opening Br."].

the complaint satisfies the applicable pleading standards.[10] On August 30, 2023, the Sellers filed their reply brief in further support of the Motion.[11]

On November 20, 2023, the Court heard argument on the Motion.

## STANDARD OF REVIEW

A motion for judgment on the pleadings filed pursuant to Court of Chancery Rule 12(c) is granted "only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[12]  When considering the motion, the court accepts well-pled facts in the complaint as true and views them in the light most favorable to the nonmovant.[13]  "[T]he proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law, and judgment on the pleadings is a proper framework for enforcing unambiguous contracts."[14]  "The court may also consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference."[15]

---

[10] Answering Br. Opp'n Defs. Marko Djukic & Shailask [sic] Sanghrajka's Mot. J. Pleadings [hereinafter "Answering Br."].

[11] Reply Br. Further Supp. Defs. Marko Djukic & Shailash Sanghrajka's Mot. J. Pleadings [hereinafter "Reply Br."].

[12] *Stone v. Nationstar Mortg. LLC*, 2020 WL 4037337, at *5 (Del. Ch. July 6, 2020) (citing Ct. Ch. R. 12(c)).

[13] *Ross v. Inst. Longevity Assets LLC*, 2019 WL 960212, at *2 (Del. Ch. Feb. 26, 2019).

[14] *Stone*, 2020 WL 4037337, at *5 (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993)).

[15] *Id.* (quoting *OSI Sys., Inc. v. Instrumentarium Grp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006)).

# LEGAL ANALYSIS

In the Motion and the briefs that followed, the Sellers and Portfolio dispute (1) whether Portfolio's claims improperly rely on extra-contractual evidence; (2) whether the contractual term "notice" in the Material Customer Representation is ambiguous and how it should be interpreted; (3) whether Portfolio pled fraud with particularity; and (4) whether Portfolio stated claims for breach of contract. The court considers the issues in that order.

## 1. Reliance on Extra-Contractual Statements

The parties dispute whether Portfolio's claims are improperly based on evidence beyond the four corners of the SPA. In the Motion, the Sellers argue that Portfolio's claims should be dismissed because they rely on the client tracker spreadsheet, which falls outside the SPA. The Sellers assert that, pursuant to the SPA's integration clause and other provisions considered together, Portfolio agreed not to rely on any representations beyond those found in the document.[16] In response, Portfolio maintains that its claims are based on the language of the SPA, and not on any extra-contractual evidence.[17]

The SPA governs the parties' business relationship and contains a merger clause. A merger or integration clause that purports to preclude reliance on anything

---

[16] Opening Br. 12-15.
[17] Answering Br. 10-12.

outside of the subject contract must "clearly state that the parties disclaim reliance upon extra-contractual statements." Murky integration clauses, and those that do not include anti-reliance language, do not relieve the parties of liability for extra-contractual fraudulent misrepresentations. An effective integration clause that limits reliance only to representations in the agreement must contain a promise by the party opposing its application "that it did not rely upon statements outside the contract's four corners in deciding to sign."[18]

In SPA § 4.07(d), Portfolio represents and warrants that it purchased Hentsu based on its own independent investigation and:

> the representations and warranties made to it in this Agreement (or as and to the extent required by this Agreement to be set forth in the Disclosure Letter) or any Transaction Agreement, and not in reliance on any representation or warranty of the Sellers, the Company, their respective Affiliatfes or any of their respective Representatives not expressly set forth therein.[19]

This provision is unambiguous. In it, Portfolio represented and warranted that it based the decision to acquire Hentsu on its own independent investigation and the Sellers' representations and warranties in the SPA, Disclosure Letter, and

---

[18] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058-59 (Del. Ch. 2006).
[19] Further, the Sellers argue that SPA §§ 2.08, 3.24, and 4.07 constitute a "complete anti-reliance clause" when considered in combination. Opening Br. 13-15. In SPA §§ 2.08 and 3.24, which are nearly identical, the parties agree that they have not made any other representations or warranties outside those in the agreement, with exceptions for situations like fraud. In SPA § 4.07, Portfolio states that it conducted its own investigation of Hentsu and based its purchase only on thee results of that investigation and the SPA's representations and warranties.

Transaction Agreements—not on any other representations or warranties by the Seller or related entities, such as those beyond the four corners of the SPA.

After analyzing the SPA's clear anti-reliance language juxtaposed with the claims raised in the complaint, it is clear that Portfolio's breach and fraud claims are based on the Material Customer Representation, and not any extra-contractual representation or warranty. In that provision, Hentsu warrants that it has not received notice of any Material Customer's intention to terminate, reduce, or adversely alter relations with Hentsu. Portfolio argues that the Sellers did have such notice. Portfolio references the client tracker spreadsheet shared by Djukic as evidence to support its claims that the Material Customer Representation was breached, rather than to establish any extra-contractual representation or warranty made by the Sellers. Thus, the reference to the client tracker spreadsheet does not implicate the ant-reliance language of the SPA. Hence, the Motion falters on this point.

## 2. Definition of "Notice"

### A. Ambiguity of "Notice"

The parties next dispute whether the term "notice," as used in the Material Customer Representation, is ambiguous. The Sellers assert that the SPA is unambiguous. And they contend that the term "notice" contemplates formal written notice relating to Duality's intention to sever or reduce relations with Hentsu, which

9

Hentsu did not have prior to the execution of the SPA.[20]  Portfolio takes a contrary position and argues that the term "notice" in the Material Customer Representation is ambiguous.  As a matter of contract construction, Portfolio asserts that the Sellers have the burden to establish that there is only one reasonable interpretation of "notice,"[21] which they fail to meet.

When interpreting a contract, the court examines "the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous."[22]  If the court can "reasonably ascribe multiple and different interpretations of a contract, [it] will find that the contract is ambiguous."  Still, the parties' steadfast disagreement does not alone render a contract ambiguous.[23]  If a contractual term is ambiguous, the court must consider extrinsic evidence in order to uphold the "reasonable shared expectations of the parties at the time of contracting."[24]

The term "notice," as used in the Material Customer Representation, is ambiguous.  In the Material Customer Representation, the requirements for "notice" of a cancellation, reduction, or adverse alteration of the terms of a client relationship can be interpreted differently by objectively reasonable third-party observers.

---

[20] Opening Br. 16-21.
[21] Answering Br. 4-7.
[22] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *9 (Del. Ch. June 30, 2004).
[23] *Ross v. Inst. Longevity Assets LLC*, 2019 WL 960212, at *3 (Del. Ch. Feb. 26, 2019).
[24] *Interactive Corp.*, 2004 WL 1572932, at *9.

"Notice" could require a formal statement of intention from the client, or a mere awareness based on the circumstances that the client is highly likely to sever or reduce relations. Accordingly, the court will have to employ the rules of contract interpretation to construe the term "notice" as used in the Material Customer Representation.

## B. Objective Interpretation of "Notice"

The parties pull from other provisions of the SPA to support their diametrically opposed construction of the term "notice," as used in the Material Customer Representation. The Sellers argue that "notice" means "a formal statement" from a Material Customer of its intention to terminate or reduce relations, received prior to the execution of the SPA. The Sellers assert that "notice" does not mean "knowledge" because the term "knowledge" was used elsewhere in the SPA but not in the Material Customer Representation.[25] Portfolio argues in favor of a more expansive interpretation of the term "notice." In Portfolio's view "notice" does not require a writing because, when the parties required such formal notice, they made it clear in other provisions of he SPA.[26] The Sellers argue that Portfolio's interpretation of "notice" is excessively broad.[27]

---

[25] Opening Br. 16-21; Reply Br. 5-11.
[26] Answering Br. 8.
[27] Reply Br. 5.

"Under Delaware law, courts interpret contracts to mean what they objectively say. This approach is longstanding and is motivated by grave concerns of fairness and efficiency."[28] The court looks to "the most objective indicia of that intent: the words found in the written instrument. As part of this initial review, the court ascribes to the words their common or ordinary meaning and interprets them as would an objectively reasonable third-party observer."[29]

In the Material Customer Representation, the Sellers represent and warrant that Hentsu has not received "notice" from a Material Customer that (1) the Material Customer was terminating or intending to terminate relations with Hentsu; (2) the Material Customer intended to reduce its purchase of services from Hentsu from 2020 levels; or (3) the Material Customer planned to adversely modify the terms of its business relationship with Hentsu.

After considering other provisions of the SPA, the Court finds that use of the singular term "notice" does not clearly contemplate "written notice." Some of the SPA's representations and warranties provide for "written notice," while others provide for mere "notice," so these terms are used distinctly, not interchangeably.[30]

---

[28] *Ross v. Inst. Longevity Assets LLC*, 2019 WL 960212, at *3 (Del. Ch. Feb. 26, 2019) (quoting *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *1 n.1 (Del. Ch. Nov. 8, 2007)).
[29] *Id.* (quoting *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del Ch. 2008)).
[30] *See* SPA § 3.08(j) ("The Company has not received any written notice, letter or complaint alleging a breach by it of applicable Privacy Laws . . . ."); SPA § 3.13(d) ("The Company has not received any written notice of any . . . inquiries, by any Governmental Entity . . . against or involving, any Benefit Plan."); SPA § 3.21(a)(i) ("At no time since January 1, 2015 has the Company . . . received any notice, request or citation for any actual or potential noncompliance

12

The parties require "notice" in the Material Customer Representation, not "written notice," which appears to be an objective indication that the parties did not intend for this "notice" to require a writing. Hence, it is reasonable to construe the term "notice" in the Material Customer Representation to be less than a formal written notice.

Further, this use of the term "notice" does not mean a "formal termination notice." In Disclosure Letter § 3.03, attached as an exhibit to the SPA, Hentsu provides that, as of the date of the agreement, "the Company has not received formal termination notice from any Material Customers." The parties required this "formal termination notice" in the Disclosure Letter but only required "notice" in the Material Customer Representation, which appears to indicate that the parties did not intend for "notice" to require a formal termination document. Hence, "notice" in the SPA does not absolutely require the client to have transmitted a formal termination document.

In the Material Customer Representation, the term "notice" does not definitively set the high bar proposed by the Sellers of a "formal statement" of a client's intention to terminate, reduce, or adversely alter business relations with Hentsu. The objective indicia of the contracting parties' intent— the words in the

---

with any Anti-Corruption Law or Anti-Money Laundering Law."); SPA § 3.23(b)(ii) ("In relation to the Company: no administrator has been appointed and no notice has been given or filed with a court of an intention to appoint an administrator.").

contract— indicate a more expansive use of "notice."  Beyond that, the Court need not determine the precise contours of the parties' use of the term "notice" at this stage in the litigation.  The Sellers have not established that the language of the Material Customer Representation is unambiguous and that their construction of the term "notice" is the only reasonable interpretation as a matter of law.  Hence, the Court denies the Motion on this point.

### 3. Pleading Fraud with Particularity

The parties dispute whether Portfolio has sufficiently pled fraud.  In the Sellers' view, Portfolio has failed to support its claim that the Material Customer Representation was made falsely.  They assert that Portfolio's fraud claim is pled in a conclusory fashion and lacks the particularity required under Court of Chancery Rule 9(b).[31]  Portfolio asserts that it has pled all the necessary allegations to satisfy the pleading requirements for fraud, at this stage of the proceedings.

Court of Chancery Rule 9(b) requires a plaintiff to plead the factual circumstances that constitute fraud with particularity.  "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation;  and  what  that  person(s)  gained  from  making  the

---

[31] Opening Br. 23-25.

misrepresentation."[32] This standard requires "detail about what was actually said, who said it, where, [and] when."[33]

In the complaint, Portfolio alleges that Djukic fraudulently induced Portfolio to enter into the SPA. Portfolio asserts that in January 2021, Djukic knowingly misrepresented to Portfolio that Hentsu considered Duality—Hentsu's highest dollar value customer in 2019 and 2020—to be a no-risk client. Notwithstanding notice of facts to the contrary, according to Portfolio, Djukic falsely represented that he had not received notice, prior to the execution of the SPA, that Duality planned to scale back relations with Hentsu. Portfolio further alleges that Djukic was involved in the plan to reduce Hentsu's services to Duality and that Djukic had acknowledged this reduction.[34] Portfolio alleges that Djukic benefited from these alleged fraudulent misrepresentations because they facilitated his then-pending sale of Hentsu to Portfolio.

Looking at these allegations as a whole, the Court finds that Portfolio has sufficiently pled the circumstances of fraud with particularity. The allegations sufficiently describe the time, place, contents, facts, identities, and intended benefits

---

[32] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *10 (Del. Ch. July 22, 2014) (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207-08 (Del. Ch. 2006)).
[33] *Id.* (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009)).
[34] Answering Br. 10-13.

of the alleged false representations. Hence, failure to plead fraud with particularity is not a proper basis for judgment on the pleadings for the Sellers.

## 4. Pleading Breach of Contract

The parties dispute whether Portfolio has stated a claim for breach of contract based on SPA § 6.01 (the "General Indemnification Provisions"), which includes the SPA's general indemnification provisions. More specifically, SPA § 6.01(a) provides that the Sellers must jointly and severally indemnify Portfolio for expenses and losses due to Hentsu's breaches of the SPA's representations or warranties and fraud. The Sellers argue that the general indemnification provisions only entitle Portfolio to indemnification for "[a]ny breach or inaccuracy in any representation or warranty" or fraud. The Sellers claim that Portfolio has failed to identify any false statement by the Sellers in the SPA or Disclosure Letter documents, so the breach claim must be dismissed. The Court has previously addressed and disposed of the Sellers' argument, premised on their position that formal written notice was required to trigger the breach of representation in the Material Customer Representation.

They further argue that the breach claim is unripe. In the Sellers' view, they could not have breached the General Indemnification Provisions because there has not yet been an adjudication of the breach and thus, Djukic has not yet incurred a duty to indemnify Portfolio.[35]

---

[35] Opening Br. 25-26; Reply Br. 14.

It is true that courts "tend to defer deciding whether a party is entitled to indemnification until after the merits of the underlying dispute have been resolved."[36] So, there will not be a placing of the proverbial "cart before the horse" here. But the Court need not dismiss the properly pled breach of contract for indemnification count when, by necessity, it will be adjudicated as part of the underlying claim.

While Portfolio cannot prevail on its indemnification claim unless the substance behind either its breach of representations and warranties claim or its fraud claim is established, this does not mean that its indemnification claim is premature. Hence, the Sellers have not demonstrated a proper basis to dismiss the claim at this stage in the litigation. Accordingly, the judgment on the pleadings is denied.

## CONCLUSION

For the forgoing reasons, the Sellers' Motion for Judgment on the Pleadings is **DENIED.**

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[36] *Brooks-McCollum v. Emerald Ridge Serv. Corp.*, 2004 WL 1752852, at *3 (Del. Ch. July 29, 2004).

17