# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CURO INTERMEDIATE HOLDINGS CORP., a Delaware corporation,

    Plaintiff, Counterclaim Defendant,

v.

SPARROW PURCHASER, LLC, a Delaware limited liability company, and CCF INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company,

    Defendants, Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2023-0371-NAC

## MEMORANDUM OPINION

Date Submitted: March 5, 2024
Date Decided: June 5, 2024

Thomas P. Will, Rachel R. Tunney, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard T. Marooney, Emma S. Nguyen, KING & SPALDING LLP, New York, New York; Jeffrey S. Rosenberg, KING & SPALDING LLP, Washington, D.C.; *Counsel for Plaintiff and Counterclaim Defendant CURO Intermediate Holdings Corp.*

Nicholas J. Rohrer, Lakshmi A. Muthu, Alex B. Haims, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Christina Golden Ademola, MORRISON & FOERSTER LLP, New York, New York; Robert W. May, Michael Komorowski, MORRISON & FOERSTER LLP, San Francisco, California; *Counsel for Defendants and Counterclaim Plaintiffs Sparrow Purchaser, LLC and CCF Intermediate Holdings LLC.*

**COOK, V.C.**

This action arises from the parties' disagreement over a post-closing accounting true-up process designed to calculate adjustments to the closing purchase price for the sale of certain entities. At bottom, the parties disagree over whether two specific provisions are contract interpretation questions requiring judicial resolution or are accounting questions to be resolved by an independent accounting firm. The seller seeks specific performance of the true-up process and, to that end, has moved for judgment on the pleadings. The purchaser seeks judicial resolution first.

This decision grants the seller's motion as it relates to the first of the two disputed contract provisions. It denies the seller's motion as to the second provision due to ambiguity in the term.

## I. FACTUAL BACKGROUND

I draw the facts from the pleadings and the documents incorporated by reference, attached as exhibits, or otherwise integral to them.[1]

### A. The Purchase Agreement

On May 18, 2022, defendants/counterclaim-plaintiffs Sparrow Purchaser, LLC and CCF Intermediate Holdings LLC (collectively, "Purchaser") entered into

---

[1] *See BBD Beach, LLC v. Bayberry Dunes Ass'n*, 2022 WL 763466, at *2 (Del. Ch. Mar. 10, 2022).

an Equity and Asset Purchase Agreement (the "Purchase Agreement") with plaintiff/counterclaim-defendant CURO Intermediate Holdings Corp. ("Seller").[2]

Under the Purchase Agreement, Purchaser agreed to buy, among other things, all equity interests in certain entities from Seller (the "Transferred Entities").[3] The parties dispute how to calculate "Working Capital" as it is used in determining various adjustments to the "Closing Purchase Price."[4]

The price adjustment process is set forth in the Purchase Agreement. The Purchase Agreement required that, no less than five days before the anticipated closing date, Seller would provide Purchaser with Seller's good faith estimate of, among other things, Working Capital (the "Estimated Closing Statement").[5]

Under the Purchase Agreement, Working Capital refers to, "as of the date or time of determination, the current assets of the Company *minus* the current liabilities of the Company, in each case as specified on Annex A of Schedule I and as calculated in accordance with the Transaction Accounting Principles."[6] Per

---

[2] *CURO Intermediate Hldgs. Corp. v. Sparrow Purchaser, LLC*, C.A. No. 2023-0371-NAC, Docket ("Dkt.") 1 ("Compl.") ¶¶ 12, 40, Ex. 1 ("Purchase Agreement"); Dkt. 36 ("Answ.") ¶¶ 12, 40.

[3] Compl. ¶ 12; Answ. ¶ 12.

[4] The adjustment amounts in dispute total roughly $3.7 million, which constitutes just over 1% of the $310 million Closing Purchase Price. *See* Dkt. 63 ("OA Tr.") 15–16; Purchase Agreement § 2.02; *see also* Compl. ¶ 13; Answ. ¶ 13.

[5] Purchase Agreement § 2.04.

[6] *Id.* § 1.01.

Schedule I, "Transaction Accounting Principles" means "[g]enerally accepted accounting principles in the United States (GAAP)."[7]

The Purchase Agreement also required Purchaser to provide Seller with an "Initial Closing Statement" no later than sixty days after closing.[8] Among other things, the Purchase Agreement required the Initial Closing Statement to include a good faith, GAAP-compliant calculation of Working Capital.[9]

Under the Purchase Agreement, from the date Seller receives the Initial Closing Statement, if Seller disagrees with "any aspect of" it, Seller has sixty days to provide Purchaser with a "Notice of Disagreement."[10] This is followed by a thirty-day "Resolution Period."[11] If the parties do not reach a resolution during this period, they must, by contract, submit all unresolved issues raised in the Notice of Disagreement to an independent accounting firm (an "Independent Accountant") for an expert determination under Section 2.06(c) of the Purchase Agreement.[12]

In relevant part, Section 2.06(c) provides:

If, at the end of the Resolution Period, Seller and Purchaser have been unable to resolve any differences that they may have with respect to

---

[7] *Id.* § 2.04(b), Sch. I.

[8] *Id.* § 2.05.

[9] *Id.*

[10] *Id.* § 2.06.

[11] *Id.*

[12] *Id.*

3

any of the matters identified in the Notice of Disagreement, Seller and Purchaser shall submit all such remaining matters to (i) PricewaterhouseCoopers, or (ii) if such firm cannot or does not accept such engagement, another nationally recognized independent accounting firm, reasonably acceptable to Seller and Purchaser, which shall not be the independent accountants of Purchaser or Seller . . . .[13]

Section 2.06(c) expressly contemplates a prompt true-up process.

## B.    Seller Disputes Purchaser's Initial Closing Statement

On July 7, 2022, Seller delivered the Estimated Closing Statement to Purchaser.[14]  The transaction closed on July 8, 2022 ("Closing").[15]  Seller received the Initial Closing Statement from Purchaser on September 6, 2022, and Seller delivered a Notice of Disagreement to Purchaser on October 24, 2022.[16]

The Notice of Disagreement outlined three points where Seller disagreed with Purchaser's Working Capital calculation in the Initial Closing Statement.[17] Two issues remain in dispute.  Of those, the first raises a dispute over the accrued vacation liability reflected in the Initial Closing Statement's Working Capital calculation.[18]  This relates to how the paid time off would accrue and carry over for

---

[13] *Id.*

[14] *See* Answ. ¶ 41; Compl. ¶ 41, Ex. 2.

[15] Answ. ¶ 43; Compl. ¶ 43.

[16] *See* Answ. ¶¶ 44–45; Compl. ¶¶ 44–45, Ex. 3 & 4.

[17] *See* Answ. ¶ 45; Compl. ¶ 45, Ex. 4.

[18] Compl. Ex. 4.

4

persons employed by the Transferred Entities after the entities are transferred and the employees are rehired by Purchaser (the "Transferred Employees").

The Notice of Disagreement provides:

*Accrued Vacation Liability*: Seller objects to Purchaser's calculation of the $3,386,399.30 accrued vacation liabilities incorporated into the Working Capital. Purchaser appears to have accrued vacation liabilities for all states in which the Transferred Entities operated or had employees. However, vacation liability should only be accrued for those states that require payout upon termination, specifically the hourly employees in California, Colorado and Louisiana, and the sales store managers in California. All other states are "use it or lose it" jurisdictions; therefore, no vacation liabilities should be accrued with respect to those employees. Seller's calculation of accrued vacation liability as of the Closing Date is $653,488, whereas Purchaser's calculation of the same was $3,386,399.30. Seller maintains its position that accrued vacation liability of $653,488 is correct for calculation of the Working Capital.[19]

Seller's position is rooted in the application of GAAP to "CURO's vacation policy," which provides employees "unlimited paid time off" and thus "does not pay out upon separation of employment, unless required by statute."[20] Thus, Seller asserts, vacation liability should only accrue in very specific circumstances.

Second, Seller disputes the amount of the accrued bonuses liability that Purchaser included in its Working Capital calculation. The Notice of Disagreement provides:

*Accrued Bonuses*: Seller objects to Purchaser's calculation of $1,313,995.93 accrued bonus liabilities incorporated into the Working Capital in its entirety. Purchaser appears to have included accrued

[19] *Id.*

[20] *Id.* Ex. 6 at 5.

5

bonuses liabilities for Short-Term Incentive Compensation, which were assumed by the Purchaser pursuant to Section 6.04 of the Purchase Agreement. Additionally, Seller paid all such bonuses related to short-term incentive compensation, call center bonuses, and referral bonuses for the second quarter of 2022 prior to the Closing. Therefore, Seller objects to Purchaser's inclusion of such liabilities in the calculation of Working Capital in the amount of $1,313,996, and believes such liabilities should be $300,000.[21]

After Seller provided the Notice of Disagreement to Purchaser, the clock began to run on the thirty-day Resolution Period. The parties undertook efforts to resolve their outstanding disagreements. On November 23, 2022, toward the end of the initial Resolution Period, Purchaser's counsel sent Seller a memorandum attempting to show that the figures Purchaser included in the Working Capital calculation for the disputed liabilities complied with GAAP, as the Purchase Agreement required.[22]

In an email that same day, Purchaser wrote that Section "2.06 of the Equity and Asset Purchase Agreement stipulates a 30 day time Resolution Period following the Notice of Disagreement after which Pricewaterhouse[C]oopers or an equivalent national firm be engaged to undertake a process to reach a final determination."[23] Purchaser thus "propose[d] extending the Resolution Period[,]" to which Seller

---

[21] *Id.* Ex. 4.

[22] *Id.* ¶ 47, Ex. 5; Answ. ¶ 47.

[23] Compl. Ex. 6 at 8.

agreed.[24]  The parties were able to resolve one of Seller's three original objections during the extension, leaving only the two referenced above.[25]

On December 23, 2022, Seller informed Purchaser that it intended to submit the dispute to PricewaterhouseCoopers ("PwC").[26]

After contacting PwC, Seller explained in a January 2023 email to Purchaser that it had "learned . . . that PwC [was] conflicted out."[27]  As a result, Seller sought another Independent Accountant, as contemplated by Section 2.06(c).[28]

At the end of January 2023, however, Purchaser raised contract interpretation issues.  Specifically, Purchaser asserted that a court must first resolve the interpretation of Sections 6.01 and 6.04 of the Purchase Agreement—addressing vacation and bonuses, respectively—before the parties can present the dispute to an Independent Accountant under Section 2.06(c).[29]

---

[24] *See id.* ¶ 48; Answ. ¶ 48.

[25] *See* Compl. ¶ 49, Ex. 6 at 5–6; Answ. ¶ 49.

[26] *See* Compl. ¶ 51, Ex. 6; Answ. ¶ 51.

[27] Compl. ¶¶ 54–56, Ex. 8; Answ. ¶¶ 54–56.

[28] *See* Compl. ¶ 56, Ex. 8; Answ. ¶ 56.

[29] *See* Compl. ¶ 57, Ex. 9; Answ. ¶ 57.

## C.    Litigation

As a result of Purchaser's new position, Seller commenced this action. Seller's complaint seeks specific performance of the dispute resolution process set forth in Section 2.06(c).  Purchaser answered and pled two counterclaims.

Seller then filed the Plaintiff/Counterclaim-Defendant's Partial Motion for Judgment on the Pleadings and Partial Motion to Dismiss the Verified Counterclaims (the "Motion").[30]  Seller argues it is entitled to judgment on the pleadings for the only count in its complaint—breach of contract and specific performance.  Seller asks the Court to enforce the accounting true-up process set forth in Section 2.06(c).[31]  Seller also argues resolution of this issue resolves the first count of Purchaser's counterclaims, which, it contends, is the mirror image of its own claim.[32]

## II.    LEGAL ANALYSIS

"A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of

---

[30] Dkt. 26–28.

[31] *See* Purchase Agreement § 2.06(c).  Relevant to whether specific performance is appropriate, Seller raises Section 11.11(a) (titled "Specific Performance"), which provides in part that the "parties acknowledge and agree that the parties shall be entitled to . . . specific performance . . . to enforce specifically the terms and provisions hereof . . . ." *Id.* § 11.11(a); Compl. ¶ 38.

[32] Seller has expressly acknowledged that its partial motion to dismiss Purchaser's second counterclaim is now moot.  Dkt. 46 ("Seller's RB") at 2 n.2.

law."[33]  "The procedural standard of review for a motion for judgment on the pleadings under Rule 12(c) is similar to that for a motion to dismiss under Rule 12(b)(6)."[34]  "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[35]  But the Court "need not blindly accept as true all allegations, nor must it draw all inferences from them in the non-moving party's favor unless they are reasonable inferences."[36]  "On a Rule 12(c) motion, the Court may consider documents integral to the pleadings, including documents incorporated by reference and exhibits attached to the pleadings, and facts subject to judicial notice."[37]

[33] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[34] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *5 (Del. Ch. July 22, 2014); *see also Bayberry Dunes Ass'n*, 2022 WL 763466, at *6 n.58 (noting that the same standard that applies to a Rule 12(b)(6) motion applies to a Rule 12(c) motion (citing *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000))).

[35] *Desert Equities, Inc.*, 624 A.2d at 1205 (footnote omitted).

[36] *Bayberry Dunes Ass'n*, 2022 WL 763466, at *2 (quoting *W. Coast Mgmt. & Cap., LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006)); *see also* OA Tr. 16 ("[Purchaser is] certainly not disagreeing with what the exhibits to the complaint say . . . .").

[37] *Bayberry Dunes Ass'n*, 2022 WL 763466, at *2 (quoting *Jimenez v. Palacios*, 250 A.3d 814, 827 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020) (TABLE)); *see also CorVel Enter. Comp, Inc. v. Schaffer*, 2010 WL 2091212, at *1 (Del. Ch. May 19, 2010) ("[U]nder Court of Chancery Rule 12(c) for judgment on the pleadings. . . . The Court also may consider the agreements attached to the pleadings in making its determination.").

"Under Delaware law, the 'proper interpretation of language in a contract . . . is treated as a question of law . . . and 'judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts.'"[38] But "[w]here the meaning is ambiguous . . . a court cannot render judgment on the pleadings."[39]

> In construing a contract, our goal is to give effect to the intent of the parties. . . . We will read the contract as a whole and enforce the plain meaning of clear and unambiguous language. . . . Language is ambiguous if it is susceptible to more than one reasonable interpretation. An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person would have accepted when entering the contract. . . . The determination of ambiguity lies within the sole province of the court.[40]

Section 2.06(c) provides that if the parties are unable to resolve "any differences" they may have with respect to "any" of the matters set forth in the Notice of Disagreement, the parties "shall submit all" remaining matters to an Independent Accountant for an expert determination.[41] As I noted above, the Purchase Agreement identifies GAAP as the governing default for calculating Working Capital.

---

[38] *OSI Sys., Inc. v. Instrume. Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006); *Fiat N. Am. LLC v. UAW Retiree Med. Benefits Tr.*, 2013 WL 3963684, at *7 (Del. Ch. July 30, 2013) ("If a contract's meaning is unambiguous and the underlying facts necessary to its application are not in dispute, judgment on the pleadings is an appropriate procedural device for resolving the dispute." (quoting *Schaffer*, 2010 WL 2091212, at *1)).

[39] *Fiat N. Am. LLC*, 2013 WL 3963684, at *7.

[40] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (footnotes omitted) (quotation marks omitted).

[41] Purchase Agreement § 2.06(c).

Purchaser argues Section 2.06(c) sets the Independent Accountant up as an expert and not an arbitrator. According to Purchaser, this means an Independent Accountant cannot be called upon to interpret the Purchase Agreement's terms. Seller does not dispute that Section 2.06(c) is an "experts" provision.[42] Thus, despite extended briefing on this point, Purchaser's characterization of the provision does not function as a basis for denying the Motion.[43]

Next, Purchaser argues the parties' dispute centers around contract interpretation issues arising from the provisions of the Purchase Agreement that address the accrual of vacation and bonuses—Sections 6.01(a) and 6.04, respectively. Thus, according to Purchaser, under a Delaware governing law and forum selection provision in the Purchase Agreement, the Court must resolve these contract issues before the parties can present any remaining accounting disputes to an Independent Accountant.[44] As I explain below, this is partially correct.

---

[42] Seller's RB at 10 (characterizing the issue as a "red herring that need not be addressed").

[43] Unless otherwise provided, "[p]rinciples of contract interpretation determine whether a disputed issues falls within [an expert provision's] scope." *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 997 (Del. Ch. 2023) (citing *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 617 (Del. 2023)).

[44] *See* Dkt. 38 ("Purchaser's AB") at 2; Purchase Agreement § 11.03.

11

## A.  Section 6.01(a): Accrued Vacation

Section 6.01(a) does not mark itself as a contractual deviation from the default treatment of the Working Capital calculation under GAAP.  Section 6.01(a) is titled "Offers to Certain Business Employees."[45]  It provides:

> Prior to the Closing, Purchaser shall, or shall cause one of its Affiliates to, use commercially reasonable efforts to make a written offer of employment, on terms and conditions consistent with the requirements of this Article 6 and applicable Law, to each Business Employee that Purchaser desires to employ after the Closing (other than the Data Center Employees), with such employment to commence immediately after the Closing.  Seller and its Affiliates shall reasonably cooperate in Purchaser's efforts to cause the Business Employees that Purchaser desires to employ after the Closing to accept such offers of employment.  Such Business Employees receiving offers of employment from Purchaser or its applicable Subsidiary shall represent the substantial majority of the Business Employees (other than the Data Center Employees).  Purchaser will include in the offer letter that any Business Employee's paid time off that is accrued and unused as of the Closing will be transferred to Purchaser on behalf of that Business Employee if the offer of employment is accepted.  Following the Closing, Purchaser shall allow each Business Employee to use such employee's paid time off that was accrued and unused prior to the Closing during their employment with Purchaser or its Affiliates.  Such paid time off assumed by Purchaser or its Affiliates shall be in addition to, and not in lieu of, paid time off accrued under the applicable plans or policies of Purchaser or its Affiliates on or following the Closing, and shall in all cases be subject to the terms and limitations of the applicable plans or policies of Purchaser and its Affiliates governing the use of paid time off.[46]

Purchaser argues the plain terms of Section 6.01(a) require it "to assume liability for accrued and unused paid time off for *all* Transferred Employees" with

---

[45] Purchase Agreement § 6.01(a).

[46] *Id.*

12

"no exceptions."[47]  Thus, according to Purchaser, this accrued vacation liability figure should be used in calculating Working Capital.[48]

Purchaser tries to frame the issue as one of whether the vacation liability is "in" (*i.e.*, whether it is included at all in the Working Capital calculation).[49]  But Seller has never argued it is not "in."[50]  Instead, Seller's argument is that, although "in," the vacation liability only accrues, per GAAP, as to certain employees, depending on the state.[51]

Put another way, as it relates to vacation liability, the parties only disagree on the *amount* of the liability included in the Working Capital calculation.  This disagreement is based on differing views of *how* to calculate that figure.  That is a

---

[47] Purchaser's AB at 27; *see also* OA Tr. 25 ("Our position is that all of the PTO that the transferred employees have earned, regardless of what the policy is, regardless of what jurisdiction they're in, transferred over to [Purchaser], and [Purchaser] is able to record that as a liability on the closing statement.").

[48] OA Tr. 25; Purchaser's AB at 1–2.

[49] OA Tr. 21, 25, 33–34.

[50] Section 6.01(a) is about the guarantees Purchaser must include in offer letters to Transferred Employees.  As Seller argues, this provision has nothing to do with how liabilities accrue under GAAP for purposes of calculating Working Capital.  Seller's RB at 5–7.  Section 6.01(a) seems to embody the parties' efforts to ensure Purchaser will maintain the status quo as it relates to Transferred Employees.  By way of analogy, assume no transaction occurred and an employer simply desired to undertake a mid-year working capital calculation that accounts for accrued vacation liability.  The employer would not need (or want) a court to run the calculation for the employer's accounting purposes—its accountant would do that.

[51] *See* Seller's RB at 6; Compl. Ex. 4–6.

GAAP question. Thus, under Section 2.06(c), the remaining dispute arising from the vacation liabilities is proper for presentation to an Independent Accountant.

This is as far as my analysis of this issue needs to go. The foregoing compels me to reject Purchaser's assertion that Section 6.01(a) raises questions of contract interpretation that must be determined before turning to the dispute resolution process set forth in Section 2.06(c).

Seller's position is based on the understanding that, absent a remaining contract dispute under Sections 6.01(a) or 6.04, an order granting specific performance of the dispute resolution process in Section 2.06(c) is appropriate. Purchaser does not contest this.[52] Instead, Purchaser asserts that the Court must first interpret Sections 6.01(a) and 6.04 before an Independent Accountant can proceed with an expert determination. For the reasons I have discussed, Purchaser is wrong as to Section 6.01(a). Indeed, although I do not rely on it in reaching my conclusion on this issue, I acknowledge that my conclusion here seems to comport with Purchaser's own characterization of the issue in its pre-litigation

---

[52] As noted above, the parties expressly agreed to specific performance. Purchase Agreement § 11.11; *see also In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 (Del. Ch. Sept. 28, 2021) ("Where parties have expressed their expectations through a specific contractual remedy, Delaware law favors enforcing that remedy."); *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348 (Del. Ch. June 5, 2006). *Compare In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 ("[T]he language of the contracts they negotiate holds even greater force when . . . the parties are sophisticated entities that bargained at arm's length." (quoting *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002))), *with* OA Tr. 14 (noting that "both sides in the deal had sophisticated legal advisors").

14

communications.  In one such communication, Purchaser expressly stated that "the relevant question under the Purchase Agreement is what vacation liabilities should be accrued under GAAP."[53]

## B.    Section 6.04: Accrued Bonuses

Seller concedes that Section "6.04 is a little bit murkier" than Section 6.01(a).[54]   Indeed, as I explain below, Section 6.04 is open to more than one reasonable interpretation at this pleading stage.

The proviso at the end of the first sentence in Section 6.04 (the "Proviso"), unlike Section 6.01(a), expressly addresses the Working Capital calculation.  The parties' arguments turn on competing readings of the Proviso.  Since both interpretations are reasonable at this stage, the Proviso is ambiguous.[55] Accordingly, I must deny the Motion as to this issue.[56]

Section 6.04 provides:

Purchaser shall be responsible for any cash incentive compensation (including annual cash bonuses, sales incentives and commissions, productivity bonuses, and spot bonuses) payable in respect of the 2022 calendar year (or any portion thereof) to Transferred Employees in

---

[53] Compl. Ex. 5 at 2.

[54] OA Tr. 37.

[55] *See Waystar, Inc.*, 294 A.3d at 1044.

[56] *See Stone v. Nationstar Mortg. LLC*, 2020 WL 4037337 (Del. Ch. July 6, 2020) (denying in part a motion for judgment on the pleadings in accounting true-up action due to ambiguity in contract term); *Fiat N. Am. LLC*, 2013 WL 3963684, *19 (denying in part a motion for judgement on the pleadings where contract term was "susceptible to at least two reasonable interpretations" and thus "ambiguous").

15

connection with their services to the Business (the "Cash Incentive Compensation"), and Seller and its Affiliates shall not have any Liability for the Cash Incentive Compensation in respect of any period following the Closing; provided that, for the avoidance of doubt, certain amounts related to anticipated Cash Incentive Compensation will be reflected as a Liability in the calculation of Working Capital. All Cash Incentive Compensation shall be governed by plans, programs or arrangements maintained by Purchaser and its Affiliates (including the Transferred Entities).[57]

The parties' primary dispute centers around the Proviso, which states: "for the avoidance of doubt, *certain amounts* related to anticipated Cash Incentive Compensation will be reflected as a Liability in the calculation of Working Capital."[58]

On the one hand, Purchaser argues that Section 6.04's structure, including the clause preceding the Proviso and the Proviso itself, permits it to include as a liability in Working Capital the pro rata portion of anticipated bonuses payable in respect of the pre-Closing part of 2022.[59] This includes discretionary bonuses. Seller, on the other hand, argues the Proviso only raises GAAP questions and should be read to exclude discretionary bonuses that "may not be paid."[60]

---

[57] Purchase Agreement § 6.04.

[58] *Id.* (emphasis added).

[59] *See* Purchaser's AB at 28–30; OA Tr. 21–22.

[60] Seller's RB at 8; Dkt. 27 ("Seller's OB") at 31; OA Tr. 39 ("That's a pure GAAP question.").

By asserting that this is "a pure GAAP question,"[61] Seller elides its interpretation of the Proviso. But the exhibits to Seller's Complaint—which I am permitted to consider at this stage[62]—make Seller's position plain. According to Seller, the Proviso's use of "certain amounts" is a reference to a specific, contemplated, and definite sum of money—$300,000. In one such exhibit, Seller explains that "the $300,000 in bonuses originally included in the working capital calculation" was "included to address the 'for the avoidance of doubt' proviso contained in Section 6.04 of the purchase agreement."[63]

Here lies the Proviso's central ambiguity. As used in the Proviso, it is not clear whether, "certain amounts" is supposed to mean (1) amounts that are certain (*i.e.*, "definite amounts") at the time of Closing or (2) amounts that are of a specific but unspecified character (*i.e.*, "some amounts").[64]

---

[61] OA Tr. 39.

[62] *See Bayberry Dunes Ass'n*, 2022 WL 763466, at *2.

[63] Compl. Ex. 6. at 6; *see also* OA Tr. 39–40 (suggesting the $300,000 figure is derived from anticipated obligations for non-discretionary hiring bonuses payable after Closing).

[64] *Compare Certain*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010) (Certain: "1 known for sure; established beyond doubt"), *Certain*, THE MERRIAM-WEBSTER DICTIONARY (2022) (Certain: "1 : Fixed, Settled . . . 4: Indisputable, Undeniable . . . 5 : assured in mind or action") (capitalizations altered), *and Certain*, ROGET'S DESK THESAURUS (2001) (Certain: "2 definite, inevitable, positive, inescapable, bound to happen, settled, sure; . . . 3 specific, particular"), *with Certain*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010) (Certain: "2 [attrib.] specific but not explicitly named or stated"), *Certain*, THE MERRIAM-WEBSTER DICTIONARY (2022) (Certain: "2 : of a specific but unspecified character"), *Some*, NEW OXFORD AMERICAN DICTIONARY (3rd ed. 2010) (Some: "1. an unspecified amount or number"),

17

If read as meaning "definite amounts," it is reasonable, as Seller argues, to read the Proviso to exclude unpaid, discretionary bonuses from the Working Capital calculation.[65]

But if read as meaning "some amounts" it is also reasonable to believe the parties may have intended, as Purchaser argues, for all bonuses paid in respect of the pre-Closing part of 2022 to be included in the Working Capital calculation. The reasonableness of this point seems especially salient as it relates to anticipated but discretionary bonuses since, if reading "certain amounts" as "some amounts," Section 6.04 does not appear to require discretionary bonuses to be treated differently from any other bonuses.

Taken together, whether explicitly or implicitly, the parties appear to ascribe different but reasonable meanings to the Proviso's use of "certain amounts." The ambiguity apparent from the text of Section 6.04 and inherent in the parties' competing positions requires me to deny the Motion as it relates to the treatment of the bonus liability in the Working Capital calculation.[66]

---

*and Some*, THE MERRIAM-WEBSTER DICTIONARY (2022) (Some: "a certain number or amount").

[65] At oral argument, Seller's counsel seems to reference the distinction between interpreting "certain amounts" as meaning "definite amounts" as opposed to "some amounts." Seller's counsel draws this distinction as it relates to hiring bonuses that were "earned" or "already accrued" at the time of Closing. *See* OA Tr. 39–40.

[66] *See Stone*, 2020 WL 4037337; *Fiat N. Am. LLC*, 2013 WL 3963684, *19.

18

### III. CONCLUSION

For the foregoing reasons, I grant the Motion as to the disputed vacation liabilities and deny the Motion as to the disputed bonus liabilities. The parties are to confer on a form of order implementing this decision.